**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 91-1988
_____


JOHN DOE, et al.,

                                        Plaintiffs-Appellees,


VERSUS

DUNCANVILLE INDEPENDENT SCHOOL DISTRICT, et al.,

                                        Defendants-Appellees.


VERSUS

KELLY KENDRICK, et al.,

                                        Appellants.

_____

No. 91-7347
_____


JOHN DOE, et al.,

                                        Plaintiffs-Appellees,


VERSUS

DUNCANVILLE INDEPENDENT SCHOOL DISTRICT, et al.,

                                        Defendants-Appellants.


_____

Appeals from the United States District Court
for the Northern District of Texas
_____
(June 16, 1993)

Before REAVLEY, SMITH, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

We withdraw our opinion issued March 29, 1993, and reported at 986 F.2d 953 (5th Cir. 1993), and substitute in its place the following opinion. The mandate shall issue forthwith.

JERRY E. SMITH, Circuit Judge:

I.

Jane Doe was twelve years old when her family moved to Duncanville, Texas, and she started the seventh grade at Reed Junior High School, in the Duncanville Independent School District ("DISD"). Doe tried out for and made the girls' basketball team at her new school and shortly thereafter learned that Coach Smith, the girls' basketball coach, regularly began or ended practice with a team recitation of the Lord's Prayer. Even though she was uncomfortable with these prayers and opposed to the practice, Doe participated out of a desire not to create dissension.

At Doe's first basketball game, the Lord's Prayer was recited in the center of the court at the end of the game, the girls on their hands and knees with the coach standing over them, heads bowed. Over the following weeks, prayers were said prior to leaving the school for away games as well as before exiting the bus upon the team's return. These prayers usually were started either by the coaches' signal or at their verbal request. Prayers apparently have been conducted in physical education classes at

2

DISD for the past seventeen years.

After attending a game and seeing his daughter participate in the prayer, John Doe, Jane's father, asked her how she felt about participating. When told that she preferred not to, John Doe told his daughter that she did not have to join in the prayers, whereupon she resolved to cease her participation.

Following this incident, John Doe contacted Ed Parker, at that time the assistant superintendent of schools. Parker was somewhat less than sympathetic to John Doe's complaint.[1]

Mr. Doe later contacted Marvin Utecht, who had replaced Mr. Parker, regarding prayer at school-time pep rallies and following basketball games. Utecht took action to halt the prayers at pep rallies but insisted there was nothing he could do regarding the post-game prayers. Mr. Doe then appeared before the DISD Board of Trustees (the "school board") to present his case, at which appearance, according to Mr. Doe, the school board showed no inclination to alter the school's practices.

Jane and John Doe subsequently filed a complaint seeking declaratory and injunctive relief against DISD, its superintendent, and the current and future members of the school board, alleging a number of objectionable religious acts, practices, and customs that they contend occurred at DISD schools and sponsored events.[2]

---

[1] Parker stated that "unless [Doe] had grandparents buried in the Duncanville Cemetery he had no right to tell [Parker] how to run his schools."

[2] Among these acts and customs were the following:

1.  Girls basketball teams from the seventh through twelfth grades (with
(continued...)

3

Upon deciding not to participate in the team prayer, Doe was required by Coach Smith, on one occasion, to stand outside the prayer circle. Moreover, at away games, at which the girls are not permitted to return to the locker room except as a group, Doe regularly had to stand apart while the coaches and students prayed.

The Does contend that the DISD thus fosters a climate in which

[2](...continued)
the exception of the seventh and eighth grade at one school) recited the Lord's Prayer before (in the locker room) and after (at center court) each game (but not, apparently, during games, although there may be an exception for last-second, buzzer-beater shots). They also routinely formed a circle and recite the Prayer before practices. The recital of a prayer at basketball games was a tradition at DISD for over 20 years.

2. The Lord's Prayer was recited during regularly scheduled physical education classes for members of the teams.

3. Prayers were said at pep rallies.

4. While traveling from away games, the teams recited the Lord's Prayer prior to leaving the school bus.

5. At awards ceremonies honoring the teams, prayers were recited, and pamphlets containing religious songs were prepared and distributed by the coaches and/or other school personnel.

6. A prayer was spoken prior to all football games conducted at fields owned and operated by DISD.

7. At other sporting events, ceremonies, and major events conducted under the direction and/or supervision of the DISD and its personnel, prayers routinely were included in the program and recited as an integral part of the event.

8. Prayers began all regular school board meetings, with the exception of special school board meetings. Prayers were said prior to each football game, graduation ceremony, baccalaureate, employee banquet, new teacher orientation, the end of the year banquet, and PTA meetings.

9. Each school in the district usually staged a Christmas program during its December PTA meeting. During these meetings, traditional Christmas hymns were sung, and the meetings began with a prayer.

10. Gideon Bibles were made available to the intermediate school students, and announcements were made that the Bibles could be picked up in the front foyer of the schools.

11. Doe's history teacher taught the Biblical version of Creation; in choir class, Christian songs routinely were sung, and the theme song for the choir )) required to be sung at all performances )) was a religious song.

DISD admitted the above acts and practices, and that they were conducted on DISD property as an integral part of DISD's curricular or extra-curricular programs while students were under the active supervision and surveillance of DISD personnel.

Jane Doe is singled out and subjected to criticism on the basis of her religious beliefs. The record shows that her fellow students asked, "Aren't you a Christian?" and that one spectator stood up after a game and yelled, "Well, why isn't she praying? Isn't she a Christian?" Additionally, Doe's history teacher called her "a little atheist" during one class lecture.

According to the DISD, administration members met with several of the coaches subsequent to the filing of this suit and told the coaches that they should permit student-initiated prayer, but that prayers were not to be allowed during classroom time and that faculty should neither initiate nor participate in prayer. By the time of the preliminary injunction hearing, all class-time prayers had stopped. Doe had no complaints during her ninth-grade year at the DISD.

                                   II.

On August 15, 1991, the Does filed an application for a temporary restraining order ("TRO") and preliminary injunction. The district court, on August 20, 1991, denied the TRO but scheduled a preliminary injunction hearing for September 16, 1991. Following a two-day trial, the court on November 18, 1991, entered a preliminary injunction. DISD filed a notice of appeal as No. 91-7347.

In the now-consolidated FED. R. CIV. P. 24 proceeding, the Rutherford Institute of Texas Foundation, <u>amicus</u> <u>curiae</u> before this court on the appeal of the preliminary injunction, proposes to

intervene on behalf of a class of DISD schoolchildren (collectively, "Rutherford") who claim their constitutional rights to the free exercise of religion stand directly and adversely to be affected by the outcome of this lawsuit.

On September 12, 1991, and (according to Rutherford) two days after they first learned that the Does had filed an application for a TRO, the putative intervenors moved to intervene and filed a third-party complaint. The court denied the motion to intervene the next day on the ground that the suit did not affect Rutherford's rights and the motion to intervene was untimely. Rutherford filed a motion to reconsider on September 27, 1991, which the court denied on October 7. Rutherford appeals, as No. 91-1988, the September 13 and October 7 orders denying leave to intervene.

III.

To obtain a preliminary injunction, a movant has the burden of proving four elements: a substantial likelihood of success on the merits; a substantial threat that he will suffer irreparable injury if the injunction is not issued; that the threatened injury to him outweighs any damage the injunction might cause to the non-movant; and that the injunction will not disserve the public interest. Apple Barrel Prods. v. Beard, 730 F.2d 384, 386 (5th Cir. 1984). We will reverse the district court's weighing of these factors only upon a showing of an abuse of discretion. Doran v. Salem Inn, 422 U.S. 922, 931-32 (1975); White v. Carlucci, 862 F.2d 1209, 1211

(5th Cir. 1989) (quoting <u>Apple Barrel</u>, 730 F.2d at 386).

## IV.

The Does claim a violation of the First Amendment's Establishment Clause. Such claims are guided by the three-part test enunciated in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971): "First, the statute [or practice] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster `an excessive government entanglement with religion.'" (Citations omitted.) Absent any one of these factors, the challenged statute or practice must be stricken as violative of the Establishment Clause.

The district court found that DISD's practices violated all three prongs )) thus presenting a substantial likelihood of the Does' succeeding on the merits )) and accordingly entered its injunctive order:

> It is therefore ORDERED that Plaintiffs' motion for preliminary injunction is granted.

> It is FURTHER ORDERED that Defendants are enjoined from permitting employees of [DISD] to lead, encourage, promote, or participate in prayer with or among students during curricular or extracurricular activities, including before, during or after school related sporting events.

> It is FURTHER ORDERED that, due to the pervasive nature of past school prayer, Defendants are to advise students of [DISD], in writing, that under the First Amendment of the United States Constitution, prayer and religious activities initiated and promoted by school officials are unconstitutional, and that students have a

7

constitutional right not to participate in such activities.

V.

Applicable Supreme Court precedent compels our conclusion that the district court did not abuse its discretion in determining that the Does demonstrated a substantial likelihood of success on the constitutional merits of their claim.  The parties point us to two different lines of precedent: a restrictive one of considerable parentage that prohibits prayer in the school classroom or environs, the most recent statement of which is the Court's opinion in Lee v. Weisman, 112 S. Ct. 2649 (1992); and a recently-carved-out exception, permitting equal access to school facilities to student-run religious groups and student-initiated prayer, see Board of Educ. of Westside Community Sch. v. Mergens, 496 U.S. 226, 243-53 (1990); Widmar v. Vincent, 454 U.S. 263, 271-75 (1981).

In Mergens, the Court interpreted the Equal Access Act (the "Act"), 20 U.S.C. §§ 4071-4074, and held that under its non-discrimination provisions, Congress constitutionally could require a school receiving federal funds, which had established a "limited open forum," to permit a student-initiated prayer group to be formed and accorded official recognition and access to facilities on an equal basis with other "noncurriculum related student groups" (e.g., Peer Advocates, Subsurfers, and the Chess Club).  496 U.S. at 247-53.  The access accompanying official recognition included use of the school newspaper, bulletin boards, and the public address system to announce meeting times and promote turnout to the school's annual Club Fair.  Mergens, id. at 246-47.

Although teachers or other school personnel can be present at

9

religious meetings, the Equal Access Act permits meetings to be held only during "non-instructional" time and school personnel to be present solely in a "custodial" capacity )) "merely to ensure order and good behavior." Id. at 252-53. While the Act does not apply to the instant case, Mergens nonetheless informs as to the parameters of the Establishment Clause.

The DISD understandably points to Mergens to support its contention that by allowing students and teachers to engage in spontaneous prayer, it merely is accommodating religion in a constitutionally permissible manner. For a number of reasons, however, Mergens is not implicated by the facts before us. First, Mergens involved noncurriculum-related activities; the crucial activity here, playing on a school-sponsored basketball team, is extracurricular.[3] Second, even if participation on the school basketball team were non-curricular, the prayer here hardly could be considered student-initiated. Coach Smith chose the prayer and where and when it was to be said and led the team in reciting it. This is not the minimal, "custodial" oversight allowed by Mergens.

Lastly, DISD has not established a "limited open forum."[4] Mergens does not reveal whether this constitutes merely a

_____

[3] The Mergens Court's test for noncurriculum activities includes consideration of whether participation results in academic credit. 496 U.S. at 239-40. At one point in its opinion, moreover, the Court seems to suggest that swimming, as part of the physical education requirement, would be curriculum-related. Id. at 245. We conclude that basketball almost certainly would not be categorized as noncurricular under Mergens.

[4] According to the Act, "[a] public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b) (1990).

10

jurisdictional requirement for the application of the Act or instead, whether it partakes of a constitutional character. But the Act, according to the Court, "extended the reasoning of Widmar to public secondary schools," Mergens, id. at 235, and Widmar undeniably premised its constitutional conclusions on the existence of a limited public forum. See Widmar, 454 U.S. at 267 ("Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." (Footnote omitted.)).

Absent the existence of a limited public forum, therefore, the neutrality considerations underlying Widmar and Mergens's anti-discrimination approach are not implicated. Cf. Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 61 U.S.L.W. 4549, 4552 (U.S. June 7, 1993). The DISD's arguments )) that no evidence was presented that students actually perceived district endorsement of religion, that students are mature enough to distinguish accommodation from impermissible endorsement, and that a proper mission of the school is to teach religious tolerance )) were rejected in Lee. Nor are DISD's attempts to distinguish the graduation setting at issue in Lee at all persuasive. Coach Smith, a DISD employee, just as surely chose and "composed" the prayer here as did the school officials in Lee. Given the "subtle coercive pressures" deemed dispositive by the Court there, Coach Smith's involvement, too, no doubt "will be perceived by the

11

students as inducing a participation they might otherwise reject." <u>Lee</u>, 112 S. Ct. at 2657. Just as at the Rhode Island graduation in <u>Lee</u>, "[o]ne may fairly say . . . that the government brought prayer into the ceremony . . . ." <u>Id</u>. at 2678 (Souter, J., concurring).[5]

<u>Lee</u> is merely the most recent in a long line of cases carving out of the Establishment Clause what essentially amounts to a <u>per se</u> rule prohibiting public-school-related or -initiated religious expression or indoctrination.[6] Nothing the DISD has presented persuades us that the instant case materially differs from this long-established line of cases. The DISD's assertion of its employees' First Amendment rights of speech, association, and free exercise, and its attempt to portray its refusal to interfere with their spontaneous religious expression as a necessary accommodation of religion, while understandable, cannot withstand analysis. Acceptance of DISD's argument would produce an unwieldy result foreclosed by precedent; in <u>Lee</u>, the Court affirmed that "[t]he principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by

---

[5] The DISD objects to the district court's citation to <u>Lubbock Civil Liberties Union v. Lubbock ISD</u>, 669 F.2d 1038 (5th Cir. 1982), <u>cert. denied</u>, 459 U.S. 1155 (1983), and <u>Brandon v. Board of Educ.</u>, 635 F.2d 971 (2d Cir. 1980), <u>cert. denied</u>, 454 U.S. 1123 (1981). Although the enactment of the Act abrogated the holding of these two cases, <u>see</u> <u>Mergens</u>, 496 U.S. at 239, a close reading of the district court's opinion reveals that the reference to these two cases primarily was for rhetorical purposes. We are persuaded that the district court's application of <u>Lemon</u> was not infected by any undue reliance upon the abrogated cases.

[6] <u>See, e.g.</u>, <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583-84 (1987) (striking down act requiring equal time for "creation-science"); <u>Wallace v. Jaffree</u>, 472 U.S. 38, 60, n.51 (1985) (act requiring one minute period for meditation); <u>Stone v. Graham</u>, 449 U.S. 39, 42 (1980) (act requiring posting of copy of Ten Commandments on classroom wall); <u>Abington Sch. Dist. v. Schempp</u>, 374 U.S. 203, 252-53 (1963) (Brennan, J., concurring) (act requiring daily Bible readings at start of school day); <u>Engel v. Vitale</u>, 370 U.S. 421, 430 (1962) (act requiring state-composed prayer to be recited at beginning of every school day).

the Establishment Clause."  112 S. Ct. at 2655.

Logically extended, the DISD's reasoning implies that the Court would have decided <u>Lee</u> differently had a teacher, rather than a Rabbi, delivered the prayer.  We cannot agree.  While the DISD correctly cites <u>Tinker v. Des Moines ISD</u>, 393 U.S. 503, 506 (1969), and its circuit court progeny as support for the scope of its employees' free exercise and free speech rights, even the most cursory reading of the Court's school prayer cases belies any notion that these may trump schoolchildren's Establishment Clause rights.  A teacher has no free exercise rights to lead schoolchildren in prayer in the classroom, for example, or to hang the Ten Commandments on the classroom wall, or even to invite a Rabbi to deliver an invocation and benediction to open graduation ceremonies. <u>See, e.g.</u>, <u>Karen B. v. Treen</u>, 653 F.2d 897 (5th Cir. Unit A Aug. 1981), <u>aff'd</u>, 455 U.S. 913 (1982) (striking down statute authorizing voluntary student or <u>teacher</u>-initiated prayer at start of school day).

We have no choice but to follow the Supreme Court's dictates in this regard.  The district court did not abuse its discretion in determining that the Does had demonstrated a substantial likelihood of success on the merits of their Establishment Clause claim.[7]

---

[7] We have eschewed the tripartite <u>Lemon</u> analysis in favor of a more case-bound approach because we believe that a fact-sensitive application of existing precedents is more manageable and rewarding than an attempt to reconcile the Supreme Court's confusing and confused Establishment Clause jurisprudence.  <u>See, e.g.</u>, <u>Committee for Pub. Educ. & Religious Liberty v. Reagan</u>, 444 U.S. 646, 662 (1979) (Establishment Clause cases "sacrifice[] clarity and predictability for flexibility"); <u>Edwards v. Aguillard</u>, 482 U.S. at 639 (Scalia, J., dissenting) (criticizing the Court's "embarrassing Establishment Clause jurisprudence").  While ordinarily "it is neither our object nor our place to opine whether the Court's Establishment Clause
(continued...)

Our decision on the remaining injunction factors )) whether there is a substantial threat that the movant will suffer irreparable injury, whether the threatened injury to the movant outweighs any damage the injunction might cause to the non-movant, and whether the injunction will serve the public interest )) follows from the initial determination that the Does likely will succeed at trial. Assuming that the Does' Establishment Clause rights have been infringed, the threat of irreparable injury to the Does and to the public interest that the clause purports to serve are adequately demonstrated. The district court so found, and we see no abuse of discretion in its determinations.

The DISD's voluntary cessation of its allegedly violative religious practices does not preclude a finding of irreparable injury. The district court, which was closer to the facts of this case, stated that "[t]he evidence leads the court to believe that there is a substantial likelihood that the alleged conduct would be reinstituted if the court refused to grant the relief requested." The district court's findings bring the instant case within our prior precedents, in which we have stated that

> mere voluntary cessation of misconduct when a suit is
> filed does not necessarily render a case moot or remove
> the necessary justiciability. The crucial test, in an

---

[7](...continued)
jurisprudence is good, fair, or useful," Jones v. Clear Creek ISD, 977 F.2d 963, 966 (5th Cir. 1992), cert. denied, 61 U.S.L.W. 3819 (U.S. June 7, 1993), we note that recent indications suggest that the Court agrees with our assessment of Lemon, essentially ignoring it in Lee in favor of the school prayer cases. See Lee, 112 S. Ct. at 2655, 2658; id. at 2685 (Scalia, J., dissenting) ("The Court today demonstrates the irrelevance of Lemon by essentially ignoring it, and the interment of that case may be the one happy byproduct of the Court's otherwise lamentable decision." (Citations omitted.)). In Lamb's Chapel, however, the Court most recently has declared that Lemon "has not been overruled." 61 U.S.L.W. at 4552 n.7.

14

> action involving a request for injunctive or declaratory relief, where defendant has voluntarily ceased his allegedly illegal conduct, is whether it can be said with assurance that there is no reasonable expectation that the wrong will be repeated.

Meltzer v. Board of Pub. Instruction, 548 F.2d 559, 566 n.10 (5th Cir. 1977) (citations omitted), cert. denied, 439 U.S. 1089 (1979).

Lastly, the DISD charges that the district court's injunction order is too broad, inasmuch as it purportedly allows student-initiated prayer only "provided such prayer is not done with school participation, supervision, or under circumstances suggesting school participation or supervision." Were we to accept this as the import of the district court's order, it might well fall afoul of Mergens, wherein the Court permitted school employees and administrators to supervise student-initiated prayer in a custodial capacity. See Mergens, 496 U.S. at 252-53.

The allegedly offending passage in the court's order appears prior to the text of the injunction. We do not rest our decision not to disturb the order on this ground, however, as we do not believe that the order, when read as a whole, reflects an intent to infringe upon the custodial supervision of genuinely student-initiated, noncurriculum-related religious groups )) a fact situation very different from that which the district court's order was designed to address. Accordingly, we construe the order as permitting Mergens-like, custodial supervision; the court's introductory language regarding "supervision," given the context of this case, more appropriately is read as prohibiting any school sponsorship of prayer or other religious activities.

## VI.

We next address whether the district court correctly denied intervention under FED. R. CIV. P. 24 to Rutherford as the representative of the proposed intervenor class of DISD schoolchildren. Rule 24 provides for both permissive intervention, see rule 24(b), and intervention as a matter of right, see rule 24(a). Of the latter category, it is only the non-statutory variety of intervention of right, set out in rule 24(a)(2), that presents itself here.[8] We review the district court's rule 24(a)(2) determinations under a de novo standard. Ceres Gulf v. Cooper, 957 F.2d 1199, 1202 (5th Cir. 1992).

Intervention under Rule 24(a)(2) is to be accorded only upon proof of four factors:

(1) the application must be timely;

(2) the applicant must have an interest in the property or transaction that is the subject of the action;

(3) disposition of the matter must impair or impede the applicant's ability to protect that interest; and

(4) the applicant's interest must not be adequately represented by the parties to the suit.

Association of Professional Flight Attendants v. Gibbs, 804 F.2d 318, 320 (5th Cir. 1986). Rutherford first claims that its motion

---

[8] Rule 24(a)(2) provides,

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

was timely. Doe disagrees, and the district court alternatively denied intervention on this ground, citing the fact that Rutherford moved to intervene just two days before the hearing on the preliminary injunction, although it had had almost four months to seek leave to intervene.

Alone among the four Gibbs factors, we review the district court's determination of the timeliness of the petition for abuse of discretion. Kneeland v. National Collegiate Athletic Ass'n, 806 F.2d 1285, 1289 (5th Cir.), cert. denied, 484 U.S. 817 (1987). In Stallworth v. Monsanto Co., 558 F.2d 257, 264-66 (5th Cir. 1977), we distilled from prior precedent four factors to be considered before passing on the timeliness of a petition for leave to intervene:

> (1) The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene [. . .;]

> (2) The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case [. . .;]

> (3) The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied [. . .; and]

> (4) The existence of unusual circumstances militating either for or against a determination that the application is timely.

See also Kneeland, 806 F.2d at 1289.

It is not altogether evident, on the record available to us, just how languid Rutherford was in pursuit of intervention. While its first petition was filed nearly four months after the Does

17

filed their original complaint and only two days before the preliminary injunction hearing, thus threatening prejudice to the Does from the almost certain delay that its entry would have occasioned, these considerations are not dispositive under Stallworth.

Of the remaining two factors, there appear to be no "unusual circumstances," and thus the only remaining factor is that of prejudice to the intervenors should their petition be denied. Here, the equities favor the Does. In adopting the Fourth Circuit's standard for adequacy of representation, we previously have stated that "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the petitioner must demonstrate adversity of interest, collusion, or nonfeasance." International Tank Terminals v. M/V Acadia Forest, 579 F.2d 964 (5th Cir. 1978) (quoting Virginia v. Westinghouse Elec. Corp., 542 F.2d 214, 216 (4th Cir. 1976)). See also United States v. League of United Latin Am. Citizens, 793 F.2d 636, 644 (5th Cir. 1986); Bush v. Viterna, 740 F.2d 350, 355-58 (5th Cir. 1984).

In the record developed to date, Rutherford has made no substantial showing that the DISD will not adequately represent its interests in the litigation.[9] By all indications, the DISD and

_____

[9] Of course, the fact that the DISD voluntarily halted prayers at its schools prior to the issuance of the preliminary injunction does not compel the conclusion that Rutherford's interests are incompatible with those of the DISD. It is the mutuality of interests in the litigation that is the proper

(continued...)

18

Rutherford are seeking the same outcome )) a declaration that the religious practices that the students wish to engage in, and that the DISD wishes to sustain, are constitutionally permissible.

Because _Gibbs_ requires all four of its factors to be present before a party may be entitled to intervention as of right, our conclusion that Rutherford has failed to overcome the presumed mutuality of the DISD's and its interests not only bolsters the district court's finding that the motion was untimely under _Stallworth_, but also suffices to deny intervention of right altogether. Accordingly, we conclude that the district court did not err in denying intervention at the preliminary injunction stage of the proceedings. Because it is foreseeable, however, that the interests of the schoolchildren and the DISD yet may diverge (for example, at the _permanent_ injunction phase of the case), the denial of intervention is hereby modified to be without prejudice to Rutherford's ability to seek to intervene at some future date.[10]

In summary, the order granting the preliminary injunction is AFFIRMED. The order denying intervention is AFFIRMED as modified. In affirming, we emphasize that the issues before us arise in the context of a preliminary, _not_ a permanent injunction. The trial of

---

[9](...continued)
inquiry, not their divergent views regarding pre-trial strategy or their respective legal obligations during the pendency of the litigation.

[10] We decline to address Rutherford's request for permissive intervention under FED. R. CIV. P. 24(b)(2). Ordinarily, "[r]eversing a denial of permissive intervention requires a clear abuse of discretion." _Kneeland_, 806 F.2d at 1289. Indeed, "[t]his circuit has never reversed a denial of permissive intervention. Such a decision by any federal appellate court `is so unusual as to be almost unique.'" _Id._ at 1289-90 (citation omitted). We note only that as we are proceeding under this exceedingly deferential standard, it is plain that the requisite abuse is not presented by the facts of this case.

19

these issues has yet to occur.  Accordingly, this opinion should not be read to pretermit their final resolution.