Lisa HERDAHL, on behalf of herself and her minor, school-age children, Plaintiff,

v.

PONTOTOC COUNTY SCHOOL DISTRICT; Pontotoc County Board of Education; John Allen, John Lauderdale, Johnny Mounce, Ken Roye, and Ricky Spencer, individually and in their official capacities as members of the Pontotoc County Board of Education; Jerry Horton, individually and in his official capacity as Superintendent of the Pontotoc County School District; Steve Carr, individually and in his official capacity as Principal of North Pontotoc Attendance Center; and Rodney Flowers, individually and in his official capacity as Assistant Principal of North Pontotoc Attendance Center, Defendants.

No. 3:94CV188–B–A.

United States District Court, N.D. Mississippi, Western Division.

April 18, 1995.

Robert B. McDuff, Jackson, MS, Danny R. Lampley, Tupelo, MS, Elliot M. Mincberg, Judith E. Schaeffer, People for the American Way, Washington, DC, for plaintiff.

Stephen M. Crampton, Scott L. Thomas, American Family Ass'n Law Center, Tupelo, MS, Phillip L. Tutor, Pontotoc, MS, for defendants.

### MEMORANDUM OPINION

BIGGERS, District Judge.

This cause is before the court on the plaintiff's motion for preliminary injunctive relief against the defendants, Pontotoc County School District ("District"), et al., seeking to enjoin the District's practice of allowing a student organization known as the "Aletheia Club" to broadcast morning devotionals and sectarian prayers over its school intercom system. The plaintiff also seeks an injunction preventing student-initiated prayers in individual classrooms during classroom hours. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202, and 42 U.S.C. § 1983. The plaintiff, suing on behalf of herself and her minor school-age children in attendance at North Pontotoc Attendance Center, has standing to bring this action.[1] A hearing having been held in this matter on February 2, 1995, the court now rules.

### I. FACTS

Plaintiff Lisa Herdahl is the mother of five children currently attending the North Pontotoc Attendance Center ("Center"), a public school located in Ecru, Mississippi. The

---

1. Pending before this court is the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6). The defendants assert that there is no "legitimate" case or controversy on the ground that Ms. Herdahl lacks standing to bring her suit since the Herdahl children are now excused from the alleged harm. This argument is without merit. As indicated *infra*, excusal does not cure the alleged constitutional violations. *See, e.g., School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The defendants' argument that Ms. Herdahl is without standing to assert constitutional claims on behalf of her children is equally without merit. *See Schempp,* 374 U.S. at 224 n. 9, 83 S.Ct. at 1572 n. 9 (parents of school children have standing to assert Establishment Clause violations); *McCollum v. Board of Educ.,* 333 U.S. 203, 206, 68 S.Ct. 461, 462–63, 92 L.Ed. 649 (1948) (same). The defendants also argue that there is no causal relationship between the constitutional violations and the harm claimed. It is, however, well established that a violation of the freedoms guaranteed in the Constitution are, as a matter of law, injurious. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The court finds that the remaining arguments to dismiss the complaint have no merit. It is unnecessary to decide at this time the merits of the defendants' motion to dismiss the individual defendants on grounds of qualified immunity.

Center provides public education from kindergarten through twelfth grade. The public address system serves the entire school and announcements are broadcast to every classroom and can also be heard in the hallways. Each morning after the principal or another designated school official makes the morning announcements, a student member of the Aletheia Club (formerly the "Christ in Us Club") leads a devotional, usually an inspirational reading from the Bible, followed by a prayer selected by the student organization which is broadcast over the intercom system. Most prayers are concluded with the phrase "in Jesus Christ, Amen" or words to that effect. The plaintiff's children are currently exempt from attending class during the broadcast. Additionally, in some elementary classes which the Herdahl children attend, vocal group prayer sometimes takes place, initiated and led by students shortly before lunch. A teacher escorts the Herdahl children out of the classroom before the practice begins. After her protests met with indifference, the plaintiff challenged the practices of the District as violative of the Establishment Clause of the United States Constitution.[2] The factors the court must consider in determining whether the issuance of an injunction is proper in this cause are firmly established. The plaintiff must show:

(1) a substantial likelihood of prevailing on the merits;

(2) a substantial threat of irreparable injury if the injunction is not granted;

(3) that the threatened injury outweighs any harm to the defendants that may result from the injunction; and

(4) that the granting of the preliminary injunction will not disserve the public interest.

*Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990) (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985)).

**2.** Although the complaint encompasses a host of practices allegedly violative of the First Amendment, such as alleged religious instruction for grades kindergarten through eight by means of a

## II. DISCUSSION

### A. Substantial Likelihood of Prevailing on the Merits

■ The court finds that the plaintiff has established a substantial likelihood that she will ultimately prevail in this action. Over thirty years ago, the United States Supreme Court held that practices substantially similar to the practices challenged in this lawsuit were prohibited by the Establishment Clause of the First Amendment. *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The Court held that morning devotional broadcasts by students over a school intercom system was an unconstitutional practice. *Id.* at 205, 83 S.Ct. at 1562. The school day described in *Schempp* began with students reading from the Bible and/or a recitation of the Lord's Prayer. As in the instant cause, provisions permitting a student to be voluntarily excused from attendance or participation in the daily prayers did not shield those practices from invalidation. *Id.* at 224–25, 83 S.Ct. at 1572–73. Although the practices were voluntary by the students, the Court found that these opening exercises were government-sponsored religious ceremonies which violated the Establishment Clause.

> [The exercises here] ... are religious exercises, required by the States in violation of the command of the First Amendment that the Government maintain strict neutrality, neither aiding nor opposing religion.
>
> [W]e cannot accept that the concept of neutrality, which does not permit a State to require a religious exercise even with the consent of the majority of those affected, collides with the majority's right to free exercise of religion. While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, *it has never meant that a majority could use the machinery of the State to practice its beliefs.*

*Schempp,* 374 U.S. at 225–26, 83 S.Ct. at 1573 (emphasis added) (footnote omitted).

course entitled "Middle East Studies," the issue before the court is confined to the intercom prayer/devotional practice and the student-led prayer in individual classrooms.

In *Karen B. v. Treen*, 653 F.2d 897, 899 (5th Cir.1981), *aff'd*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982), the Supreme Court summarily affirmed the Fifth Circuit's holding that practices similar to those now before the court violated the First Amendment. The practices at issue in *Karen B.* followed local school board regulations established pursuant to Louisiana enabling legislation and allowed a classroom teacher to ask students whether they would like to offer a prayer, and if no one volunteered, the teacher was permitted to lead the class in prayer. *Karen B.*, 653 F.2d at 899. As in *Schempp*, exemption from participation was permitted. The Fifth Circuit Court of Appeals noted:

> The defendants contend that the challenged statute and regulations are not constitutionally infirm because they are entirely content-neutral and because student participation in the daily prayer is purely voluntary. Neither of these features cures the constitutional defect.
>
> ... The Supreme Court consistently has expressed the view that the First Amendment demands absolute governmental neutrality with respect to religion, neither advancing nor inhibiting any particular religious belief or practice and neither encouraging nor discouraging religious belief or unbelief.

*Karen B.*, 653 F.2d at 901.

Also, from the appellate court's recitation of the operative facts in *Hall v. Board of Sch. Comm'rs of Conecuh County*, 656 F.2d 999 (5th Cir.1981), it may be gleaned that "(1) permitting students to conduct morning de-

votional readings over the school's public address system, and (2) teaching an elective Bible Literature course in a manner which advanced religion" was found to be prohibited by the Establishment Clause:

> Everyone seems to be in substantial agreement that the conducting of morning devotional was unconstitutional under established law. *See School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The district court so held, and the defendants state that they have discontinued the practice.

*Id.* at 1000 (citation omitted). *See also Meltzer v. Board of Pub. Instruction of Orange County*, 548 F.2d 559, 579 (5th Cir.1977) (morning devotional consisting of Bible reading and/or recitation of Lord's Prayer by students or teachers over public address system unconstitutional),[3] *aff'd on reh'g*, 577 F.2d 311 (1978) (*en banc*), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979).

Other circuits are in accord. In *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824 (11th Cir.), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the Eleventh Circuit addressed a constitutional challenge to student-initiated invocations before high school football games.[4] As is the case with the practice at the Center, the students in *Jager* invoked the name of Jesus Christ in their prayers. *Id.* at 826. The court rejected the school's asserted secular purpose of solemnization stating that it was clear that the school district's motivation was to "publicly express support for Protestant Christianity." *Id.* at 830. Furthermore, the court

---

3. Although the surrounding factual circumstances of the challenged morning exercises in *Meltzer* were unclear, the various practices stemmed from a school board resolution "calling for a five to seven minute morning exercise in every school to consist of a 'period of meditation which shall include the opportunity for individual prayer and Bible reading or devotional or meditation presented by groups or organizations or an individual,' followed by a patriotic exercise." *Meltzer*, 548 F.2d at 561. The court held that practices ranging from having students read inspirational selections from the Bible over the PA system to simply "providing 'a period of meditation ... that would provide the opportunity for individual prayer or Bible reading'" did not cure the constitutional infirmities that we have found as to the initial board resolution and

practices ordered pursuant to that resolution. Specifically, we find that it is the daily Bible reading to students in a 'captive audience' situation over the public address system each morning, which is violative of the First and Fourteenth Amendments.

*Id.* at 574.

4. In *Jager*, the school district adopted an equal access plan that allowed any student organization to designate club members to give the invocation. Any student, parent or school staff member could seek to deliver an invocation. The student government was to select at random the speaker with no input from clergymen or review by the school as to content. *Jager*, 862 F.2d at 827.

found the primary effect of the invocation to be in furtherance of religion. *Id.* at 831. Most significantly, the court held the use of a sound system controlled by the school principals necessarily conveyed a message that the school endorsed the broadcasted religious messages. *Id.*

■ The defendants contend that the practices of the District are legal and, in fact, mandated by the Constitution. What is at issue in this cause, the defendants allege, are the practices of students protected by the First Amendment, rather than actions of the District abridging those protections. It is their position that (1) the District has created and maintains a limited public forum that is the school's intercom system; and (2) the Equal Access Act prohibits the District from preventing the Aletheia Club or any other student group from using the forum for the broadcasts at issue. *See Board of Educ. of Westside Community Sch. Dist. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). *Mergens* and its progeny involve religious groups denied access to public school facilities for fear that such access would violate the Establishment Clause. The Supreme Court has consistently held that when the State denies religious groups the same access it provides to other groups, the State has engaged in unconstitutional discrimination. *See, e.g., Lamb's Chapel v. Center Moriches Sch. Dist.,* — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Mergens,* 496 U.S. at 248, 110 S.Ct. at 2370–71. The court finds no evidence of the existence and maintenance by the District of a public forum at the beginning of the school day at the Center, either in the form of a written policy or by actual past practice. *See Student Coalition for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Directors,* 776 F.2d 431, 436 (3d Cir.1985). The District may have a valid argument that it created a public forum at the "activity period" offered between certain classes each day. At this time, all student organizations are permitted to meet. However, it is not suggested that any student

organization other than the Aletheia Club could conduct similar activities after the morning announcements and before class instruction begins.[5] Accordingly, the court rejects for lack of evidence the proposition that the District's involvement is limited to the maintenance of a public forum, the existence of which cannot be found or inferred on this record.

■ The Fifth Circuit recently analyzed the prevailing Supreme Court Establishment Clause jurisprudence regarding the government's involvement in school prayer. In *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), the court set out three tests used in evaluating whether a public school's involvement with religion violates the Establishment Clause. The first of these tests was set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under the *Lemon* test, the challenged conduct must: (1) have a predominantly secular purpose; (2) have a primary effect that neither advances, endorses nor inhibits religion; and (3) not result in excessive entanglement of government and religion. *Id.* at 612–13, 91 S.Ct. at 2111–12. The *Lemon* test has however fallen out of favor in recent years. *See Jones,* 977 F.2d at 966; *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 166 n. 7 (5th Cir.1993). Although it is not necessary to analyze the District's practices under all three of these tests since each test is dispositive and can alone raise serious questions that would end the discussion, such an analysis is, however, helpful in demonstrating the extent of the District's violations.

### 1. The Lemon Test

#### a. Secular Purpose

■ The court finds that the District's practice of allowing, and previously introduc-

---

**5.** Assuming *arguendo* that such a forum exists, it is undisputed that it has never been used for any purpose by any other "student organization" and for any purpose other than the "announcement" of the devotional followed closely by sectarian

prayer. Generally, when other "clubs" have announcements to make, the same are made by school officials in the course of the daily announcements that precede the morning devotional.

ing,[6] morning prayers and devotionals broadcast throughout the school is not for a secular purpose. The defendants argue that the practice constitutes a solemnization of the beginning of each school day. In support of this contention, the defendants primarily rely on *Jones,* 977 F.2d at 968 (invocation at high school graduation ceremony held secular purpose).[7] The court is not persuaded that the District's motivation for allowing prayer is predominantly secular. This cause does not involve a once-a-year event such as graduation (once-a-lifetime event for participants) as in *Jones.* Unlike high school graduation, there is nothing so momentous or singularly important about the beginning of each school day that justifies a *Jones* type solemnization. *Ingebretsen v. Jackson Pub. Sch. Dist.,* 864 F.Supp. 1473, 1488 (S.D.Miss.1994). Indeed, it could be argued that such a practice lessens the importance of events such as graduation—the very event the *Jones* court noted was in need of "attach[ing] importance to...." *Jones,* 977 F.2d at 968. Even assuming *arguendo* that the District's purpose is secular, however, the practice fails to pass muster under the remaining prongs of the *Lemon* test.

### b. Primary Effect

■ Even if the court were to accept the District's contention that the purpose of allowing morning devotional and prayer is solemnization and not religious, that is not its primary effect. *Lemon* condemns government action if it has the primary effect of advancing religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111. The dictates of the Establishment Clause are violated when "government action 'creates an identification of the state with a religion, or with religion in general,' ... or when 'the effect of the governmental action is to endorse one religion over another, or to endorse religion in general.'" *Lee v. Weisman,* 505 U.S. ——, ——, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467, 479 (1992) (citations omitted). Helpful in the determination of whether a practice advances religion is consideration of the extent to which the practice is nonsectarian and nonproselytizing. *Jones,* 977 F.2d at 967. In the instant case, the practice is neither. Invoking the name of Jesus Christ and broadcasting it throughout the school at times when attendance is mandatory[8] necessarily chooses religion over nonreligion and, moreover, Christian beliefs over other religious beliefs.

Although in the strictest sense this practice is "student-initiated," the manner in which the District accommodates the Aletheia Club by turning over the school public address system to be broadcast into each room, places the District's seal of approval on this practice. When a student is told to be silent and listen to the school's official morning announcements, at the conclusion of which the school principal hands control of the address system over to a student solely for the purpose of prayer and scripture reading, the students reasonably believe that the school, a governmental institution, is advocat-

---

**6.** Evidence adduced at the preliminary injunctive hearing indicates that the defendants' practices have changed since the instigation of complaints by the plaintiff of the morning devotional/"student-initiated" prayer. Prior to the plaintiff's protests, the student member of the "Christ in Us Club" was introduced by a school official, stating, "Now we will have the morning devotional." That practice has now been abandoned.

**7.** The defendants also cite *Allegheny County v. Greater Pittsburgh ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), and *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). With regard to the solemnization issue, these cases, however, only serve to acknowledge the Supreme Court's position in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (prayer commencing legislative day serves legitimate secular pur-

pose of solemnization). Because of the "history and ubiquity" of that particular practice, the Court reasoned that these expressions were not perceived as government endorsement of religion. *Allegheny,* 492 U.S. at 625, 109 S.Ct. at 3118 (O'Connor, J., concurring); *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369–70 (O'Connor, J., concurring). As there is no evidence presented of any unique history of the District's practice, e.g., over 200 years of a past practice, these cases are of little value.

**8.** As noted previously, the District has stated that it attempted to accommodate the Herdahls by excusing those children who do not wish to participate. Clearly, that practice does not cure the constitutional defect. *See Lee,* 505 U.S. at ——— ———, 112 S.Ct. at 2658–61, 120 L.Ed.2d at 484–87; *Schempp,* 374 U.S. at 224–25, 83 S.Ct. at 1572–73; *Ingebretsen,* 864 F.Supp. at 1488.

ing religion and, in particular, the Christian faith. Such activity by a private school, of course, would face no constitutional scrutiny. Furthermore, when young children hear daily certain religious expressions, they may be proselytized to the particular religion revered by those expressions. *See Karen B.,* 653 F.2d at 901 ("Prayer is perhaps the quintessential religious practice ... [i]ndeed, since prayer is a primary religious activity in itself, its observance in public school classrooms has, if anything, a more obviously religious purpose than merely displaying a copy of a religious text in the classroom"). "To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic interference is too dangerous to permit." *Brandon v. Board of Educ. of Guilderland Cent. Sch.,* 635 F.2d 971, 978 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); *Roemer v. The Board of Pub. Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). *See also Collins v. Chandler Unified Sch. Dist.,* 644 F.2d 759, 761 (9th Cir.) ("no meaningful distinction between school authorities actually organizing religious activity and officials merely 'permitting' students to direct the exercises"), *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). Allowing these religious expressions at a time contemporaneous with the beginning of the official school day implies recognition of religious ideals as an integral part of the Center's school day and an implicit approval by the school officials of the belief advocated. *Lubbock Civ. Lib. Union v. Lubbock Indep. Sch. Dist.,* 669 F.2d 1038, 1045 (5th Cir.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983). Therefore, the court finds that the District's practice has the primary effect of advancing religion and, as a consequence, that practice runs afoul of the Establishment Clause.

### c. Entanglement

■ Finally, the practice violates the third prong of *Lemon* because it involves excessive government entanglement with religion. The court in *Lemon* indicated that excessive entanglement could be determined by an ex-

amination of "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112. The District's practice of requiring students to be seated in their homeroom classes, to be silent and to pay attention to the official morning announcements while the school principal introduces the devotional and prayer and/or hands control of the address system over to the Aletheia Club for "student-initiated" prayer excessively entangles and in fact facilitates the District's involvement in religion. In this regard, the District is pressuring, if not mandating, students to attend and participate in the prayer.

Additionally, it has been held that teacher supervision necessarily leads to interference with or advocacy of religious activities. *See Brandon,* 635 F.2d at 979 (if the government must engage in continuing supervision of religious activity, church and state become excessively entangled); *Bell v. Little Axe Indep. Sch. Dist. No. 70,* 766 F.2d 1391, 1404 (10th Cir.1985) (teacher supervision and monitoring necessarily impart impression of endorsement); *Lubbock,* 669 F.2d at 1047 (prohibiting morning Bible readings over school public address system grounded in part on supervision of students by teachers); *Karen B.,* 653 F.2d at 902 (monitoring and enforcing one minute time limitation on prayer created excessive entanglement). These decisions base their finding of excessive entanglement on each school district's responsibility for student safety and discipline in its respective schools. Since the teachers at the Center must also supervise and monitor the practices at issue in the instant cause, during official school hours, it follows *a fortiori* that the District has excessively involved itself with religion and crossed the line drawn between church and state.

### 2. Endorsement

■ The State impermissibly endorses religion "when a reasonable person would view the challenged government action as a disapproval of her contrary religious choices." *Jones,* 977 F.2d at 968 (citing *Lee,* 505 U.S.

at —— n. 9, 112 S.Ct. at 2665 n. 9, 120 L.Ed.2d at 493 n. 9); *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In *Jager*, the Eleventh Circuit held:

> When a religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school-owned facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation.
>
> . . . .
>
> Furthermore, to persons of any age who do not believe in prayer, religious invocations ... convey the message that the state endorses religions believing in prayer and denigrates those religions that do not.

*Jager*, 862 F.2d at 831–32 (cited with approval in *Ingebretsen*, 864 F.Supp. at 1487–88 (noting "even student-initiated nonsectarian and nonproselytizing invocations and benedictions may run afoul of the 'endorsement' test.")). Clearly then, the manner in which the District allows the prayer and devotional impermissibly endorses a particular religion over religions in general and favors religion over nonreligion.

### 3. Coercion

■ The *Lee* Court identified three factors indicative of unconstitutional coerciveness when: (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors. *Lee*, 505 U.S. at ——–——, 112 S.Ct. at 2654–55, 120 L.Ed.2d at 480. *See also Mergens*, 496 U.S. at 261, 110 S.Ct. at 2377–78 (Kennedy, J., concurring) ("The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity"). Although the *Lee* Court stressed the direct and complete control over the challenged practice as determinative, *see Jones*, 977 F.2d at 970, the practices in the instant cause are not as obvious. It has long been recognized that "First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.'" *Widmar v. Vincent*, 454 U.S. 263, 268, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981) (citations omitted). Examination of the circumstances giving rise to this action reveals subtle coercive pressures whose effects on the students obviously differ depending on the maturity levels of the students at the Center (kindergartners through high school seniors). While students in grades 7–12 have a conscientious choice to join the Aletheia Club, and thereby accept its particular belief system, grades K–6 do not have this choice. Nevertheless, grades K–6 receive the same religious indoctrination from the older students regardless of their particular sensitivities. Furthermore, children at this impressionable age may not be able to distinguish between the "official announcements" and the "student-initiated" prayer and scripture reading that immediately follow. *See Schempp*, 374 U.S. at 307, 83 S.Ct. at 1616 (Goldberg, J., concurring) (noting that there are heightened concerns with protecting freedom of conscience from subtle coercive pressures in elementary and secondary public schools).

In *Ingebretsen*, the court concluded that when students are subjected to prayer "in a 'captive audience' situation, the state, although not officially delivering the prayer, may be effectively coercing students who do not wish to hear or participate in a prayer to do so." *Ingebretsen*, 864 F.Supp. at 1488. Moreover, in *Meltzer*, cited previously, the court did not confine its decision solely to the state's direction, holding "[s]pecifically, we find that it is the daily Bible reading to students in a 'captive audience' situation over the public address system each morning which is violative of the First and Fourteenth Amendments." *Meltzer*, 548 F.2d at 574. Furthermore, as stated previously, the District's attempt at accommodating the plaintiff's children by excusing them from class does not cure this constitutional deficiency. The *Schempp* Court held daily Bible readings and class recitation violative of the Constitution notwithstanding that the students could be excused from class. *Schempp*, 374 U.S. at 226, 83 S.Ct. at 1573–74; *see also Engel v. Vitale*, 370 U.S. 421, 430, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962) (recognizing that voluntary observance of prayer by students does not serve to free it from limitations of Establishment Clause).

■ Permitting students to absent themselves from broadcasts or classroom prayer which they find offensive does not cure the Establishment Clause problem and can be a destructive approach. Contrary to its stated purpose and intent, organized prayer in public schools does not unite students from various backgrounds and beliefs but, instead, segregates students along religious lines. The plaintiff's children are likely to feel ostracized and stigmatized if their beliefs do not coincide with those of the majority. The peer pressure inherent in a high school or elementary school environment exaggerates the stigma that may be experienced by nonconforming students. *See e.g. Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538 (3d Cir.1984), *vacated on standing grounds*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). A method of accommodation that is inclusive of those students who wish to participate is far better that a practice that excludes those that do not.

Based on the foregoing, the court finds that the plaintiff has amply demonstrated a substantial likelihood that she would prevail on the merits of this case.[9]

### B. A Substantial Threat of Irreparable Injury

■ The court finds that the plaintiff has adequately demonstrated that she will suffer irreparable injury if the District's practices are not enjoined. The fact that the District has discontinued its introduction of the student devotional and prayer does not convince the court that the plaintiff is without threat of irreparable injury since that is not the only objectionable practice in dispute. In addition, the court is not satisfied that the threat of future reinstatement of the practice can be discounted. *See Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir.1993). When First Amendment freedoms are lost, even if for minimal periods of time, irreparable injury has occurred. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

### C. The Threatened Injury to the Plaintiff Outweighs the Threatened Harm the Injunction May Cause the Defendants

■ The District does not argue that it would be harmed by an injunction prohibiting broadcast of prayers and devotionals to all students at the Center. It would be disingenuous for the District to take such a position in light of its disavowance of involvement in the challenged practice. The court rejects the District's contention that the issuance of an injunction would have a "chilling effect" on the exercise of First Amendment rights of the students who want the broadcast and prayers. The issuance of an injunction would have no bearing on the students' ability to freely exercise their existing rights under the First Amendment through other constitutional methods. The students remain free to exercise their rights before and/or after official school hours. Accordingly, the court finds that the threatened injury to the plaintiff outweighs any harm the injunction would cause the defendants.

### D. Public Interest

■ The court finds that the public interest will not be disserved by enjoining the unconstitutional practices of the District.

### III. CONCLUSION

For the foregoing reasons, the court finds that the manner in which the District permitted prayer and scripture reading in the Center does not reflect a clearly secular purpose but has a primary effect that advances religion and does not avoid excessive government entanglement with religion. Moreover, it has the effect of endorsing or placing the governmental institution's seal of approval on these religious practices. Therefore, the cur-

---

**9.** The same Constitutional infirmities befall the District's practice of permitting student-led prayer during classroom hours for elementary-age children. The District cannot allow students to assume control of a class, while still in session, in order to give a clearly sectarian prayer. Such a practice creates the "captive audience" situation that has consistently been found to place imper-

missible pressures on children to conform and accept the beliefs advocated. *Lee*, 505 U.S. at ——, 112 S.Ct. at 2678, 120 L.Ed.2d 467; *Schempp*, 374 U.S. at 203, 83 S.Ct. at 1562; *Meltzer*, 548 F.2d at 559; *Karen B.*, 653 F.2d at 897. Absenting oneself, or as in the instant case, being escorted out of the classroom by the teacher, does not solve the problem.

rent practices run afoul of the Establishment Clause to the United States Constitution insofar as they are conducted and permitted during official school hours and the prayed for injunction must issue.

This court met with the parties to this suit in off-the-record settlement discussions on several occasions in an effort to reach agreement on a practice involving school prayer that would be mutually agreeable to the parties. The teachers and administrative personnel of this school district are sincere in their beliefs that the practices in their school which are the subject of this suit are beneficial to the students personally and the general educational atmosphere there. The plaintiff mother harbors no disagreement with the classmates of her children engaging in secular religious practices as long as no coercion, open or subtle, and no stigma are attached to her children, who do not participate in the activities.

The discussions between the parties produced some agreed-on results which the court incorporates herein as a record of partial settlement of the issues involved in this emotionally-charged case dealing with some of man's most deeply felt principles.

The students in grades 7 through 12 may hold voluntary student devotionals before school hours begin each morning in the school gymnasium. Students who wish to participate in these activities may choose to go to the gym before the school bell rings. Students choosing not to attend who are on the school property at this pre-school time may remain in the school yard, in the school cafeteria where breakfast is served or go to their homeroom classrooms in inclement weather. The plaintiff and her counsel did not agree to these pre-school activities for students in grades kindergarten through 6, citing the lack of ability of children of this age group to make a meaningful voluntary decision to attend or not to attend. The court nevertheless is of the opinion that if the parents of the children of this age group clearly advise the school student groups sponsoring the devotionals that their children may attend, the agreed-on pre-school activities for grades 7 through 12 may also be attended by the younger age group. The

court sees no reasonable complaint the plaintiff could make about this type of activity as it relates to her children, who would be free to remain playing in the school with others, eating breakfast in the school cafeteria or, in case of inclement weather or for other good reasons, going to their homerooms until school hours begin. The school officials have expressed a concern that there might be more pupils who choose to attend and do attend these pre-school activities than the school gymnasium has space to accommodate. If that does happen—and there would have to be more in attendance than could be accommodated after extra substantial measures were taken to do so—the court finds nothing objectionable in the superintendent's alternative proposal to designate special classrooms which the students could go to before school begins, prior to the time anyone has even been required to be on the school property, for student-led devotionals. The rooms so designated, if they become necessary because of the lack of sufficient space in the gymnasium, of course, could not be homerooms where students who choose not to participate in the devotionals would be going in case of inclement weather before school or for other reasons.

### ORDER

In accordance with the memorandum opinion this day issued, it is ORDERED:

That the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED;

That the plaintiff's motion for a preliminary injunction is GRANTED and the defendants are ENJOINED from transmitting or in any way permitting or authorizing the transmission of morning devotionals, including without limitation the recitation of Bible verses and/or prayers, over the school intercom system or permitting student-led devotional activities during school hours at the North Pontotoc Attendance Center.

This order does not restrain the rights of the students in attendance at the Center from exercising their First Amendment rights through reasonable use of any means of communication, not inconsistent with this opinion, before or after the official school day.

### ORDER OF CLARIFICATION

Came on to be considered this day the motion of the plaintiff in the above styled and numbered cause moving the court to clarify its order of April 18, 1995 in which the court authorized as part of a settlement agreement (*see* memorandum opinion at pages 20–22) activities, prior to the school day beginning but on the school property, in which the students engage in morning devotionals which might also include prayer. The plaintiff's motion for clarification is correct in that the settlement discussions engaged in between the court and the parties resulted in an agreement and the court so AUTHORIZES the practice in which a neutral activity period, prior to classes, is set aside during which students in grades 7 through 12 are free to participate in any club of their choice or in no club at all and to come and go to various students activities or remain in the school yard, including assembling in the school gymnasium for a morning devotional. In essence, the pre-school activity period is available for any student organization to meet and carry on its activities, including student religious groups who might wish to conduct a morning devotional.