Lisa HERDAHL, on Behalf of Herself and Her Minor, School-age Children, Plaintiff,

v.

PONTOTOC COUNTY SCHOOL DISTRICT; Pontotoc County Board of Education; John Allen, John Lauderdale, Johnny Mounce, Ken Roye, and Ricky Spencer, in Their Official Capacities as Members of the Pontotoc County Board of Education; Jerry Horton, in His Official Capacity as Superintendent of the Pontotoc County School District; Steve Carr, in His Official Capacity as Principal of North Pontotoc Attendance Center; and Rodney Flowers, in His Official Capacity as Assistant Principal of North Pontotoc Attendance Center, Defendants.

No. 3:94CV188–B–A.

United States District Court, N.D. Mississippi, Western Division.

June 3, 1996.

Robert B. McDuff, Robert B. McDuff, Attorney, Jackson, MS, Danny R. Lampley, Danny R. Lampley, Attorney, Tupelo, MS, Elliot M. Mincberg, Judith E. Schaeffer, Peo-

ple for the American Way, Washington, DC, for plaintiff Lisa Herdahl.

Scott L. Thomas, Stephen M. Crampton, American Family Association Law Center, Tupelo, MS, Phillip L. Tutor, Phillip L. Tutor, Attorney, Pontotoc, MS, J. Max Edwards, Jr., Tutor, Henry & Edwards, Tupelo, MS, Michael Whitehead, Michael Whitehead, Attorney, Lee's Summit, MO, for defendants Pontotoc County School Dist., Pontotoc County Board of Education, John Allen, John Lauderdale, Johnny Mounce, Ken Roye, Rick Spencer, Jerry Horton, Steve Carr, Rodney Flowers.

## MEMORANDUM OPINION

BIGGERS, District Judge.

Plaintiff Lisa Herdahl is a resident taxpayer and mother of five children who are currently attending the North Pontotoc Attendance Center ("Center" or "North Pontotoc"), a public school located in Ecru, Mississippi. The Center provides public education from kindergarten through the twelfth grade. On December 20, 1994, the plaintiff filed this action under 42 U.S.C. § 1983, seeking relief from the school prayer practices, religious Bible instruction, and other practices of the defendants Pontotoc County School District ("District") and its officials that allegedly violate the Establishment Clause[1] of the United States Constitution. A hearing was held on February 2, 1995 on the issues of the school (1) allowing prayers over the school-wide intercom system during classroom hours and (2) allowing individual classroom prayers prior to lunch. On April 18, 1995, this court preliminarily enjoined the defendants' school prayer practices, including the broadcast of morning prayer over the school intercom and organized, vocal prayer in classrooms during instructional time. *Herdahl v. Pontotoc County Sch. Dist.,* 887 F.Supp. 902 (N.D.Miss.1995) (cited with approval in *Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274 (5th Cir.1996)). The court incorporates by reference the fact-finding of its previous opinion herein. Additional facts

necessary to the court's ruling are set out below.

A bench trial was held on March 4–6, 1996. The claims that remain for review by the court are: 1) the school-wide intercom prayer and devotionals; 2) the new pre-school activities of the Aletheia[2] Club as to grades K–6; 3) classroom prayer prior to lunch in grades K–6; 4) the current teaching method of the Bible class; and 5) the alleged injection of religious materials in American History class. Upon due consideration of the issues presented, the evidence produced at both hearings, the exhibits and arguments submitted by the parties, the court is prepared to rule.

## DISCUSSION

The court is once again confronted with a conflict between the goals of two divergent but well-meaning groups. At issue is the meaning each wants to ascribe to the Establishment Clause. "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' " *Everson v. Board of Educ.,* 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947) (emphasis in original) (citing *Reynolds v. United States,* 98 U.S. 145, 162, 25 L.Ed. 244, 249 (1874) (quoting a letter from Thomas Jefferson to a Danbury Baptist Association committee)). The founding fathers believed that this clause would guard against the abuses of government and the abuses that might be committed by the community itself.

The District's witnesses testified that the school prayers should continue because a majority of the students and parents are in favor of the practice and Mrs. Herdahl is the only person who opposes the practice; however, the Bill of Rights was created to protect the minority from tyranny by the majority. Indeed, without the benefit of such a

---

1. The Establishment Clause was made applicable to the states through the Fourteenth Amendment. *Everson v. Board of Educ.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

2. "Aletheia" is a Greek word, meaning truth. The former name of the club was the "Christ In Us" Club.

document, women in this country have been burned because the majority of their townspeople believed their religious practices were contrary to the tenets of fundamentalist Christianity.[3] To say that the majority should prevail simply because of its numbers is to forget the purpose of the Bill of Rights. It is not insignificant that the opening line of our enumeration of individual rights reads "Congress shall make no law respecting an establishment of religion...." U.S. Const. Amend. I. Of course, that amendment has been interpreted by the Supreme Court to prohibit not only Congress but also the states and their subdivisions, such as counties and school districts, from inserting themselves into religious practices. *Everson*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The court is now called upon to give effect to the words of the Constitution as they relate to the practices of a public school in Pontotoc County, Mississippi, in accordance with the opinions previously issued by the United States Court of Appeals for the Fifth Circuit and the Supreme Court of this land.

## I. INTERCOM PRAYER

■ Prior to this court's preliminary injunction, the District contended that its stated policy and practice on the issue of schoolwide prayer over the intercom was that the Center would permit student clubs or organizations brief access to the public address system, following the morning announcements by the administration, for the purpose of making any student announcement or any other free speech comments the students desire. The Aletheia Club, formerly the Christ In Us Club, one of the recognized student clubs at the school, had frequently

utilized this period of time to present a short devotional, or inspirational message, which often included a short Bible reading, frequently followed by a short prayer. The entire devotional and prayer generally lasted no longer than a minute or two. During this period, teachers directed students who were standing to be seated and directed students who were talking to be quiet, if necessary, and at least some teachers in their classrooms bowed their heads for the prayers and devotionals.[4]

■ At the preliminary injunction hearing, this court held that the plaintiff established that there was a substantial likelihood of prevailing on the merits of this issue, and a violation of the Establishment Clause was clearly evident. The District did not appeal the ruling at the preliminary injunction stage; however, it is still the District's position that it has created a "limited open forum" as described in the Equal Access Act ("Act"). 20 U.S.C. § 4071 *et seq.* The Act prohibits public secondary schools that receive federal financial assistance and that maintain a "limited open forum" from denying equal access to "students who wish to conduct a meeting within that limited open forum...." 20 U.S.C. § 4071(a). By permitting student clubs or organizations the right to request and use the public address system for a brief moment for announcements or such other appropriate use following the official morning announcements, the District contends that it cannot now discriminate against the Aletheia Club on the religious content of the club's message. This argument was analyzed by this court in its April 18, 1995 opinion and found to be unpersuasive.[5] At trial, the court permitted the

**3.** Heinrich Kramer, *Malleus Maleficarum* 222–23 (Dover Publications) (1971).

**4.** The evidence that some teachers were participating in the morning devotionals, by bowing their heads, bolsters the court's coercion analysis in its preliminary injunction opinion. *Herdahl*, 887 F.Supp. at 910–11. The Supreme Court warned that "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). Further-

more, teacher instruction to be quiet and pay attention to the morning announcements, which are followed by prayer and scripture reading, generates pressure on students to conform to the belief system advocated. *Lee v. Weisman*, 505 U.S. 577, 592, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467, 484 (1992). The aura of state involvement is inescapable in this type of environment.

**5.** The court considered the District's forum argument both in terms of the Equal Access Act's "limited open forum" analysis and the constitutional analysis of a "limited public forum." *See Board of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 241–42, 110 S.Ct. 2356,

defendants to present evidence of their forum theory. Accordingly, the defendants have introduced evidence that other student clubs and organizations frequently utilize the intercom system for making announcements, such as fund raisers, pep rallies, yearbook sales, and election results. Furthermore, they have attempted to introduce evidence of student use of the intercom as a vehicle for their free expressions beyond mere announcements; however, the evidence nevertheless shows that, excluding the Aletheia Club, the intercom was used only for *announcements* of club activities, including announcements to encourage students to participate in activities, and not for the actual conduct of substantive club activities themselves. For example, the yearbook staff has made announcements over the intercom that it will meet at designated times and places, but it has not conducted the substance of its meeting over the intercom. The Aletheia Club, however, has not only announced the times and places of its meetings over the intercom, it also has said the prayers and read the devotionals that it gives in its meetings. That is a significant distinction that the defendants have refused to recognize, or at least admit.

■ The defendants' arguments notwithstanding, it is evident to the court that the Equal Access Act is not applicable to the practices of the District and the Aletheia Club. First, the Act applies only to secondary schools, 20 U.S.C. § 4071(a), while it is undisputed that the intercom prayers were broadcast into all the classrooms at the Center, a K–12 school. Moreover, the Act applies by its terms only to *voluntary meetings* of secondary school clubs. *Id.* at § 4071(c)(1). A "meeting" is defined, rather circularly, by the Act as "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." *Id.* at § 4072(3). Examining the relevant legislative history, however, provides more guidance. The Senate Judiciary Committee commented that:

> There would be no "religious teacher" supplied by the school. Instead, the students themselves would be able to initiate and direct meetings that include religious expression. Such meetings would be voluntary in the truest sense of the word. In order for any student to attend, it first would be necessary for at least one student to take the initiative and arrange the meeting. Any other student desiring to participate would then have to reject the various other secular activities available to him and go to the room where those few other students who have a common interest would be meeting for religious activities. Indeed, the individual students would be selecting on an individual basis the activities in which they wished to participate.

S.Rep. No. 357, 98th Cong., 2d Sess., 1984, *reprinted in* 1984 U.S.C.C.A.N. 2348, 2374 (footnote omitted).

In *Thompson v. Waynesboro Area Sch. Dist.,* 673 F.Supp. 1379 (M.D.Pa.1987), the district court was faced with a similar activity. In *Thompson,* two students began distributing copies of a religious newspaper in the hallways of the junior high school before classes commenced. Their professed motivation was to communicate the "Christian viewpoint" to other students. The school district prohibited this activity and the students filed suit. The court, in relying on the definition of "meeting" in the Act and from the same legislative history explained:

> From [the above cited] portion of the Senate report it appears that a major characteristic of the meetings for which the

2367–68, 110 L.Ed.2d 191 (1990); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Although the defendants did not raise the constitutional issue of a limited public forum, the court considers and dismisses the same. First of all, the court finds no evidence for the existence of a limited public forum at the Center for the political, social or religious expressions of the student body broadcast schoolwide contemporaneously with the morning announcements. Second, even if the District created such a forum, there would exist a compelling governmental interest in prohibiting the practices of the Aletheia Club as they would run afoul of the Establishment Clause as determined in the court's preliminary injunction. *See Widmar,* 454 U.S. at 270–73, 102 S.Ct. at 274–76, 70 L.Ed.2d at 448–50; *Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160, 1168 (7th Cir.), *cert. denied,* 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993).

Equal Access Act guarantees an opportunity is the voluntariness of the meetings. The voluntariness of the meetings would be protected by the fact that the meetings would be entirely student initiated. Voluntariness would also be ensured by the fact that *a place would be set aside where it would be necessary for the students to go* in order to attend the meeting. Equally, the voluntariness of a student's choice of an activity in which he wished to participate would be protected in that he could reject any other activity by simply not going to the place designated as that activity's meetingplace.

*Thompson,* 673 F.Supp. at 1383 (emphasis added). The court concluded that the distribution of the religious newspaper was not protected by the Act as the activity could not be considered a "meeting" as defined under the Act. *Id.* at 1383–84.

Implicit in the legislation is the desire to protect students from the "captive audience" situation the court has cautioned the District from creating. *Herdahl,* 887 F.Supp. at 910; *see also Ingebretsen v. Jackson Pub. Sch. Dist.,* 864 F.Supp. 1473, 1488 (S.D.Miss.1994) ("[i]f students are subjected to prayer in a 'captive audience' situation, the state, although not officially delivering the prayer, may be effectively coercing students who do not wish to hear or participate in a prayer to do so"), *aff'd,* 88 F.3d 274 (5th Cir.1996); *Meltzer v. Board of Pub. Instruction,* 548 F.2d 559, 574 (5th Cir.1977) ("[s]pecifically, we find that it is the daily Bible reading to students in a 'captive audience' situation over the public address system each morning which is violative of the First and Fourteenth Amendments"), *aff'd on reh'g,* 577 F.2d 311 (1978) (*en banc*), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1989). The court therefore concludes that the broadcast of religious messages over the public address system is not a "meeting" under the definition provided in the Act or as contemplated in the legislative history. It is not the type of activity in which student clubs at the Center are already permitted to engage in. Other student clubs are not permitted to conduct their club business during the morning announcements and in fact are only permitted to meet during the activity period set aside during the school day or after school. Only announcements of school or student activities are permitted with the sole exception of the Aletheia Club's practices. This special accommodation of the Aletheia Club for its admittedly religious messages is clearly prohibited by the Establishment Clause, *see Herdahl,* 887 F.Supp. at 907–11, and not authorized by the Equal Access Act.

Although the student members of the Aletheia Club expressed their views voluntarily, the students to whom these views were broadcast did not voluntarily choose to be there; rather, they were there under the mandate of law. Prior to the injunction previously issued herein, the Aletheia Club apparently considered all the school classrooms its meeting place. Such practices over a school intercom broadcast to captive audiences of students are clearly not meetings and are not "voluntary in the truest sense of the word." Indeed, Superintendent Horton conceded during his trial testimony that the activities of the Aletheia Club were not meetings, and it is obvious that those practices go beyond mere announcements of the clubs' activities. Activities which are voluntary both for those who initiate them and those who participate in them are the activities which Congress envisioned protecting under the Act. Thus, the District's reliance on the Act as a defense to these intercom prayers is misplaced.

Additionally, the following stipulation was accepted by the court in the pre-trial order: "During the morning announcement period, students sometimes made announcements over the school intercom of school and student activities, such as when senior yearbook sales would begin or when a particular club would be meeting next.... *There is no evidence of student use of the school intercom during the morning announcement period other than for announcements of school and student activities as set forth above and the broadcast of prayers and morning devotionals.*" ¶ 7 Pre-trial Order at 12 (emphasis added).

Clearly then, the District's reliance on its policy of providing a brief moment for wide-open discussion of any free speech comments

by the student body is belied by this stipulation. Even if this court were to assume that the District "opened" its intercom system for any and all organizational "announcements," it is clear from the record (or lack thereof) that the math class is not permitted to discuss euclidean geometry; the science club does not express the views of Newton; and the Chorus club does not sing. Although campaign speeches for Student Government are allowed, this cannot be equated to the functions of that organization. In fact, the only club that has been provided the opportunity to actually espouse its beliefs over the intercom is the Aletheia Club. Thus, while the District may have a valid argument that it has created a forum to permit announcements of school and student activities, the evidence clearly shows and indeed the District stipulates that it is not maintaining a soapbox for the religious, social or political expressions of members of the student body who want to preach, teach or politicize over the intercom system.

■ The case law in this country has consistently recognized that the conduct of such morning devotionals broadcast by students over a school intercom system is an unconstitutional practice. *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 223–26, 83 S.Ct. 1560, 1572–74, 10 L.Ed.2d 844 (1963); *Hall v. Board of Sch. Comm'rs of Conecuh County*, 656 F.2d 999, 1000 (5th Cir.1981); *Meltzer*, 548 F.2d at 574; *Herdahl* 887 F.Supp. at 905. As a matter of law, even if the defendants established a limited open forum for student speech over the intercom, devotionals and sectarian prayer broadcast over the public school loudspeaker would still violate the First Amendment. As the Supreme Court noted in *Schempp*, it is the act of turning over the "machinery of the State" to the students in the religious majority to broadcast their religion which violates the Constitution, and that act cannot be justified as accommodating the First Amendment rights of the students who wish to do so. *Schempp*, 374 U.S. at 226, 83 S.Ct. at 1574, 10 L.Ed.2d at 860; *See also Herdahl*, 887 F.Supp. at 905. As the Fifth Circuit put it, "it is the daily Bible reading to students in a 'captive audience' situation over the public address system each morning" that is uncon-

stitutional. *Meltzer*, 548 F.2d at 574. The defendants cannot "sanitize an endorsement of religion forbidden under the Establishment Clause by also sponsoring non-religious speech" in the "coercive context of public schools." *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1168 (7th Cir.), *cert. denied*, 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993). The preliminary injunction opinion will therefore be adopted in all relevant respects and a permanent injunction will issue.

## II. PRE–SCHOOL ACTIVITIES

■ Since the court's injunction, the Aletheia Club has been conducting its morning prayers and devotionals starting at 7:50 a.m. in the high school gymnasium. The students in grades 7–12 who wish to participate in the morning prayer and scripture reading go to the gym. At 7:58 a.m. a bell signifies the impending commencement of the school day. Students then have three minutes before the final bell rings at 8:01 a.m. to arrive in their homeroom class. The plaintiff does not object to this practice as it relates to grades 7–12. The students in grades K–6 are also allowed to participate in the Aletheia Club's morning activities on the condition that they furnish written parental requests for them to do so. *Herdahl*, 887 F.Supp. at 912. Because of the large turnout for these activities, the Center allowed students in grades K–3 to go to a separate activity room where members of the Aletheia Club would administer the same devotional that was given in the gym. Students in grades 4–6 were permitted to attend the activities with grades 7–12 in the main gym. The plaintiff objects to the participation of grades K–6 in any morning religious activity period on the basis of the age and impressionability of the children. *See Bell v. Little Axe Indep. Sch. Dist.*, 766 F.2d 1391 (10th Cir.1985) (holding that requirement of teacher supervision at religious meetings in elementary school would create impression of state sponsorship).

It had been generally held that mere teacher supervision necessarily leads to interference with or advocacy of religious activities and thus ran afoul of the Establishment Clause. *See Lubbock Civ. Lib. Union v.*

*Lubbock Indep. Sch. Dist.,* 669 F.2d 1038, 1047 (5th Cir.1982) (prohibiting morning Bible readings over school public address system grounded in part on supervision of students by teachers), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Karen B. v. Treen,* 653 F.2d 897, 902 (5th Cir.1981) (monitoring and enforcing one minute time limitation on prayer created excessive entanglement), *aff'd without op.,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982); *Brandon v. Board of Educ. of Guilderland Cent. Sch.,* 635 F.2d 971, 979 (2nd Cir.1980) (noting if the government must engage in continuing supervision of religious activity, church and state become excessively entangled), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); *Herdahl,* 887 F.Supp. at 909 (noting above cited cases).

However, the Supreme Court in *Board of Educ. of Westside Community Sch. Dist. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), revisited the issue as it related to secondary schools and the application of the Equal Access Act. The Court held that "custodial oversight of the student-initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in the day-to-day surveillance or administration of religious activities." *Id.* at 253, 110 S.Ct. at 2373.

Recently, the Fifth Circuit has recognized this view as abrogating the specific holdings of *Lubbock* and *Brandon. Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 165 n. 5 (5th Cir.1993). Thus, the District's practices as they relate to grades 7–12 are not objectionable. The plaintiff argues that elementary schoolchildren are "vastly more impressionable than high school or university students and cannot be expected to discern nuances which indicate whether there is true neutrality toward religion on the part of a school administration," citing the *Bell* decision, 766 F.2d at 1404.

■ The court is of the opinion that this delicate situation is resolved in favor of the current practice based on the informed written consent of the individual child's parents. Without question, parents possess the inherent right to control the religious upbringing of their children. *Pierce v. Society of Sis-*

*ters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder,* 406 U.S. 205, 213–14, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972). The Court explained "that the parental right to guide one's child intellectually and religiously is a most substantial part of the liberty and freedom of the parent." *Pierce,* 268 U.S. at 518, 45 S.Ct. at 571. Having the authority to act in the stead of the child, a parent's maturity and ability to discern the difference between faculty supervision and implicit endorsement of the religious ideals expressed at the meeting is imputed to the child. Through parental consent, the elementary children are on equal footing with secondary school students, who the Supreme Court has held are mature enough to differentiate between sponsorship and mere custodial oversight. *Mergens,* 496 U.S. at 250, 110 S.Ct. at 2371–72. Furthermore, the court finds that no imprimatur of state involvement is exhibited in this practice as it relates to the non-participating students. The risk of the appearance of improper state involvement is significantly diminished in an opt-in type of situation as exists here, as opposed to an opt-out situation in the classroom prayer practices. Students who wish to participate in the pre-school devotionals actively seek out involvement in the religious activity without burdening those who do not. Moreover, the compulsory attendance laws, that have driven many courts to find subtle coercive pressures, do not operate prior to the commencement of the school day. Therefore, students who are present before the school day begins are not compelled to be there and do so of their own free will. Without such a determination, there would be a per se rule against the participation of elementary students in any organized religious activities based solely on the required custodial oversight of the children.

Accordingly, the court finds that the current practices of the Aletheia Club for all grades prior to school should be permitted to continue. The court therefore modifies the preliminary injunction opinion, *Herdahl,* 887 F.Supp. at 909, to reflect the current changes. Additionally, the court notes that in this present practice teachers are not per-

mitted to participate in the religious meetings.

## III. CLASSROOM PRAYER

■ The issue of organized classroom prayer in elementary classrooms at the Center prior to lunch was also dealt with in the preliminary injunction. *See Herdahl,* 887 F.Supp. at 911 n. 9. As Superintendent Horton testified, subject to the discretion of individual teachers and classes, such prayer was authorized to be led by students prior to the preliminary injunction. Until this court's order, such prayer was·facilitated directly by elementary teachers. For example, kindergarten teacher Suzanne Montgomery testified that she designated one child each day as a "blessing sayer-helper" to lead the pre-lunch prayer. In January 1995, Principal Flowers instructed teachers concerning the "Blessing for Lunch," directing them specifically to tell students that they could conduct "the lunch blessing" in the classroom before the class left for lunch and·the teachers were to separate out· non-participating students by having them "step out in the hallway with [the teacher]." Ex. P3.

This conduct clearly violates the dictates of the Establishment Clause. Organized prayer in the classroom, where students have no choice but to participate or to conspicuously "step out in the hallway," is unconstitutional whether led by students or teachers. *See Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962); *Karen B. v. Treen,* 653 F.2d at 902. By informing students of the appropriate time to conduct a lunch blessing, the state is facilitating this prayer. The courts have clearly ruled that inviting or encouraging students to pray violates the First Amendment. *See Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Karen B.,* 653 F.2d at 901–02; *Ingebretsen,* 88 F.3d at 280–81. The defendants' practice in directing teachers to pause before the class leaves for lunch, to specifically announce and provide an opportunity for vocal group prayer, and to separate out in the hallways those who do not

wish to pray is patently contrary to the separation of church and state. Nothing herein interferes in any way in each student's right to individually pray at the lunch table in the cafeteria, or to individually·pray silently at any other time.

## IV. BIBLE CLASS

For the past 50 years, a .committee in Pontotoc County comprised of members from some of the local Protestant churches and commonly referred to as "the Bible Committee" has sponsored classes in which the Bible has been taught in the local public schools. Under this . program, the Bible Committee hires teachers who are allowed by the District to conduct classes on school property during normal school hours. The Bible teachers have no employment contracts with the District, and are the only teachers working in the school district who are not paid by the District. The District maintains that it has supervisory authority over the teachers. The District provides classroom space at the Center for the Bible class in all grades in which it is taught, as well as related materials such as bookshelves. In addition, the District provides public funds to the Bible teachers to be used for the purchase of books, supplies, and other materials to be used in the course, and such funds have been expended for such purpose.

Previous to the 1993/1994 school year, a course simply known as "Bible" was offered to the students at the Center. Prior to the plaintiff's enrollment of her children in the local public school, the Mississippi State Department of Education ("MSDE") rejected the "Bible" class as an approved accredited curriculum at the Center. In an effort to "preserve the integrity and essence of what they had been teaching already," the Bible Committee developed a new curriculum entitled "A Biblical History of the Middle East."[6] The Committee submitted a three-year pilot program for approval by the MSDE, which was granted. The Center began offering the approved curriculum for the 1993/1994 school year. This same curriculum

---

**6.** The court will refer to the course at issue in any of its subsequent forms as the "Bible class,"

regardless of its official designation.

is the basis for teaching the participating grades at the Center, with the obvious exception that the teaching methods are adjusted to the level of the age group being taught.

In the elementary grades at the Center (K–6), the course is taught as a "rotational class," alternating once every four days with music, library, and physical education. The Bible teachers come into the students' regular classrooms and replace the regular teachers, who generally leave the rooms. Although the other rotational classes are required classes, the District has made an exception for the Bible class. Students who do not wish to participate are excused and may get up in front of their classmates and leave the classroom. During this period, the only alternative instruction for them is to be sent to another rotational class for their grade, which merely duplicates a rotational class they have already taken or will take, so that the children end up taking the same class twice. The plaintiff's children who are subject to the District's rotational class program are now excused from participating in the Bible class and are escorted to and from another rotational class by the teacher or assistant. The plaintiff claims that being singled out in this manner has exposed and continues to expose her children to harassment and ridicule, and they have been accused of being atheists and devil worshippers.

The Bible class taught in the high school grades (9–12) is open to any student as a one-hour elective. Kevin Engle is the plaintiff's only child old enough and therefore eligible to attend the high school Bible class. Engle has not attended this class and indicated that he has no plans to do so in the future.

The issue currently before the court is not whether it is appropriate for public schools to teach the Bible, rather, it is the method of that instruction that is in question. Both parties agree that the study of the Bible in public schools is not per se unconstitutional. Indeed, the Supreme Court has noted:

[I]t might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicated that such a study of the Bible or of religion, when presented *objectively as a part of a secular program of education*, may not be effected consistently with the First Amendment.

*Schempp*, 374 U.S. at 225, 83 S.Ct. at 1573, 10 L.Ed.2d at 860 (emphasis added). The District does not contend that its practice of allowing private organizations to operate and fund a course involving the teaching of the Bible serves to free the District from the constraints placed upon it by the Constitution. Indeed, such a position could not be supported. *See Illinois ex rel. McCollum v. Board of Educ.*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Doe v. Human*, 725 F.Supp. 1503 (W.D.Ark.1989), *aff'd*, 923 F.2d 857 (8th Cir.1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). Instead, the defendants argue that the course is taught from a "historical and literary perspective, in a non-sectarian, non-proselytizing manner, for the primary purpose of educating students with regard to important historical figures, historical events, and literary contributions, during this time period in world history, and the relationship of such events, persons, literary contributions to future civilizations." Thus, the court is faced with the constitutional question of not that the Bible is taught, but the selectivity, emphasis, objectivity, and interpretive manner, or lack thereof, with which the Bible is taught.

The court will examine the Bible class as currently taught at the Center with respect to the prevailing constitutional analytical tests: the *Lemon* test, the Endorsement test, and the Coercion test.[7] *Jones v. Clear Creek Indep. Sch. Dist.*, 977 F.2d 963, 966 (5th Cir.1992), *cert. denied*, 508 U.S. 967, 113

---

**7.** Although the District has introduced a new curriculum for a course entitled "Biblical History of the Ancient Middle East," which they intend to offer in all future classes, the court is only asked to rule on the curriculum as it is currently being taught. The court, however, notes that the revised curriculum was not objected to by the plaintiff's expert. Indeed, Dr. Lewis indicated that this curriculum could be the basis for an objective secular study of that time period.

S.Ct. 2950, 124 L.Ed.2d 697; *Ingebretsen*, 88 F.3d at 278; *Herdahl*, 887 F.Supp. at 907–11. Although the court utilizes the analytical tests as guideposts, it recognizes that much of Establishment Clause analysis must necessarily rely on a fact-sensitive approach.

## A. The Lemon Test

The first of these tests, and the one which has created the most controversy was collected into its current form in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under *Lemon*, a government practice is constitutional if (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not excessively entangle government with religion. *Id.* at 612–13, 91 S.Ct. at 2111–12. The court finds that the Bible class in its current form not only fails one prong—enough to render it unconstitutional—it fails all three prongs of the test. Each prong is examined below.

### 1. Secular Purpose Prong

The Bible class clearly lacks a secular purpose. From its inception by the local Protestant churches, the aim of the instruction has been overtly religious in nature. The District's profession of educational instruction in this relevant time period of world history is belied by the evidence presented to the court at trial. First, the fact that the District contracted out the teaching of this class indicates an attempt at avoiding the constitutional ramifications of this instruction. If the class were truly secular, there should be no necessity of disassociating itself (and thus the state) with such a practice. The District cannot accomplish through others what it is forbidden to establish itself. Second, the selection procedures for the Bible teachers indicate a religious agenda unquestioned by the District. As the acknowledged "sponsor" of the Bible classes, the Bible Committee seeks out prospective Bible teachers for the public schools, interviews and then selects them, using religious criteria that have resulted in a teaching staff of Christian teachers who teach the Bible, and are expected to teach the Bible, from a fundamentalist religious perspective as the inerrant word of God.

When a Bible teaching vacancy occurs, it is the Bible Committee, not the school district, that initiates the hiring process, and it does so not by an open job search or through advertisements, but by personally soliciting names of potential teachers from the present and former Bible teachers. The District is well aware of this religious testing, and has to date not turned away any selected Bible teacher. Prospective Bible teachers are interviewed by the Bible Committee, and their religious beliefs and "salvation experience" of the candidates and their "personal spiritual background [and] beliefs about the Bible" are routine topics during job interviews. The chairman of the Bible Committee, Mr. Olen White, stated at trial that he personally believed that it was important for the prospective teacher to consider the Bible as literally true. It is also his understanding that the teachers who are currently teaching the Bible class at the Center are teaching their classes from the perspective that the Bible is literally true and without error. According to White, the Bible classes involve "reaching children for the Lord." In a thank you letter to participating local churches, White stated that "[w]ithout the help of the churches, the Bible program could not exist. Continue to pray for this work with our young people. They need all the Christian influence that can be given." Reverend William Sims, a pastor of a local church and member of the Bible Committee, testified that he expects that a teacher of a Bible course would teach the Bible as the inerrant word of God. He further stated that if it came to his attention that one of the Bible teachers was teaching the Bible as if it were capable of error or that one of the teachers was not of the Christian faith he would not want the Committee to continue to fund that person's salary. This religious testing, plainly imposed on prospective Bible teachers, alone makes the practice an unlawful intrusion into the school curriculum. *Wiley v. Franklin*, 468 F.Supp. 133, 144, 150 (E.D.Tenn.1979) (citing *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961)).

For over ten years the high school Bible class was taught by Pastor Larry Dean Patterson, including the first year of the pilot

program. Pastor Patterson testified that when he decided to leave his position, he so informed the Bible Committee and it requested that he recommend someone with suitable training and credentials for his replacement. Patterson understood this to mean someone with the same religious beliefs, such as believing that the Bible is the inerrant word of God. With these criteria in mind, Patterson recommended Mike Thompson to the Committee. Thompson has been the sole teacher for all participating grades at the Center for the past two years of the pilot program.

It is Patterson's belief that the Committee would not consider hiring a Jew or a Muslim for the teaching position because they would not be teaching the Bible from the "perspective that the people in Pontotoc understand the Bible." That perspective, and the perspective that the Committee expected to be taught was the fundamentalist Christian perspective. This, according to Patterson, was the reason for having the Bible class in the first place. Indeed, according to Patterson, without this interpretation one can "miss the whole purpose of the Bible." The court does not have to analyze the testimony in great depth to conclude that the predominant purpose of Patterson's instruction was to espouse to his students the tenets of Christian fundamentalist views.

According to Pastor Patterson, the Bible classes were taught using the Bible as "a historical text," meaning he taught it "as events that actually happened," e.g., teaching Genesis as "actual literal history." Furthermore, Patterson testified that he believes the Bible to be the inerrant, revealed and inspired word of God. He tells his students of his personal belief and, most significantly, he testified that he taught the Bible in accordance with this belief. Significantly, the Bible is the only text used in his course and any tests that are given are based solely on the content thereof. The primary version used is the King James version, commonly accepted as a Protestant translation of the Bible. Neither the Catholic Bible nor the Jewish Bible have been used.

Other indicia of the religious purpose of the course is evidenced by the reasons for continuing the course for the 1993/1994 school year. When the MSDE dropped the accreditation for the Bible class, the teachers and the Committee were concerned that the number of students who would wish to participate in the class would significantly decrease because they would not receive credit for it. The response was to establish a pilot program so that, in the words of Pastor Patterson, they could "preserve the integrity and essence of what they had been teaching already." Despite its new name, there is no indication that the "Biblical History of the Middle East" class was any different than the course that was previously dropped. In fact, Patterson explained that there were virtually no changes from the methods or subjects taught in the new pilot course. The fact that the teachers were teaching the same course that was disapproved by the MSDE indicates a motive by the sponsors of the program to continue to impart religious doctrine to the students at the Center, and raises the question of how many years the MSDE would allow a District to continue teaching an obviously illegal course by merely changing the name and proposed teaching method but not the substance or actual teaching of the course.

■ This "business as usual" practice by the Bible teachers in the District did later meet with criticism but no action when the MSDE sent a social studies expert to observe the classes. Joann Prewitt observed several classes taught at other area schools by Patterson and Thompson during the first two years of the pilot program. Although Prewitt did not observe the class at the Center, both Patterson and Thompson admitted that there was no difference in their instruction as Prewitt observed at the other schools. The court therefore overrules any objections to Prewitt's testimony that have been raised by the defendants. Prewitt testified in deposition that what she observed being taught was religious Bible instruction presented from a Christian perspective, not the objective teaching of a secular social studies course.[8] She explained that Pastor Patter-

8. Pastor Patterson also explained that when     Prewitt came to observe the class and lend any

son's class was "taught as a Bible class, not history," and similarly when she observed Thompson's class the next school year she noted that "from Mr. Thompson's class, tests and materials" that "he was teaching a religious class," not "a history class." According to Prewitt, the tests, lesson plans and student activities that she reviewed and observed "represented a Christian Biblical viewpoint and did not bring in to play any other—any other viewpoints from a different perspective."

Prewitt also testified of a particular concern that the teachers were using the Bible as the sole basis for instruction.[9] She recommended to the principal and the Bible teachers that other sources in addition to the Bible be utilized. Dr. Thomas W. Lewis, the plaintiff's expert, also voiced strong concerns over the complete reliance on the Bible as a historical source. In fact, Dr. Lewis testified that it would be "extremely difficult" to construct a secular course dealing with history and literature with the Bible as the subject and the only text in the course.

Furthermore, Dr. Lewis, a Ph.D. and a practicing ordained Methodist minister and professor of religion, concluded that, based upon his examination of the courses and the course materials and in light of his experience and expertise, the Bible course at the Center is a religious, not secular teaching, and is not being taught objectively as part of a secular program of education in history and literature. The court is firmly persuaded by this and other evidence that the predominant purpose of the Bible class is not secular, rather, it is a part of a concerted effort by the religious sponsors of the class, fully condoned by the District, to inculcate students at North Pontotoc into the beliefs and moral code of fundamentalist Christianity—an admirable goal perhaps for some private citizens or for a private religious school, but a forbidden one for the government.

## 2. The Primary Effect Prong

As can be expected of a practice that is religious in nature and purpose, it is by no means accidental, and certainly not incidental, that the primary effect is that of advancing religion, and moreover, a particular sect of religion. The same evidence validates the conclusion that not only does the course have a religious purpose, that is also its primary effect. It therefore violates the second prong of *Lemon*. The testimony of the Bible teachers themselves, the lesson plans, exams and Bible class materials, as well as other evidence adduced at trial, all confirm that the Bible classes offered at the Center advance religion in general and, specifically, fundamentalist Christianity. It is not "presented objectively as part of a secular program of education."

Mike Thompson, the current Bible teacher in the elementary and high school grades at

---

assistance and suggestions on how to properly conduct instruction according to the curriculum, he informed her that "God has seen to it that this course had been taught for over 40 years."

**9.** The court is likewise concerned with the selection of one "Bible" as the sole basis for teaching a course in middle eastern history. For what is the "Bible"? Generally, it is considered to be "a collection of religious books and writings which have been selected and assembled for the religious teachings and messages therein conveyed." *Wiley*, 468 F.Supp. at 149. The books that comprise the Bible depend on the religious faith to which one adheres. For instance, most Protestant Bibles contain 66 books in all—39 books which make up the "Old Testament" and 27 books which make up the "New Testament." However, the Catholics' Douay or New American versions of the Bible include additional books which they believe are also the inspired word of God. The Protestants consider these books as "Apocrypha" and do not deem them to be canon. Unlike the King James version, the Catholic ver-

sions are annotated to provide the official Church interpretation and explanation of the text. Thus, to simply read the Bible without note or comment is to eschew the Roman Catholic way of reading the Bible. Kurt T. Lash, *The Second Adoption of the Establishment Clause: The Rise of the Nonestablishment Principle*, 27 Ariz.St.L.J. 1085, 1122 (1996). Judaism has as its holy book the Hebraic Bible. It differs from the Old Testament of the Christians in that the latter have included several books which did not exist in Hebrew. Other religions have their "Bible." For example, the Bible of Islam is the Koran or Qur'an. The "Bible" selected by the Committee was, not surprisingly, a Protestant King James version. Thus, by allowing the Committee to design and develop a course based on the community's Protestant beliefs, the District has abandoned its institutional role and blurred the line between secular and parochial education.

the Center, uses *The Kids–Life Bible Story-book* to teach in grades K–2. This book was purchased by Thompson in a Christian bookstore and he agrees it "is a children's version of a Bible that Christians would use." The book is subtitled on the cover "Stories That Help Your Child Apply The Bible To Life."

After reading the Bible stories aloud, Thompson asks the children what he calls the "fact" questions at the end of each story, in addition to some of his own. These "fact" questions frequently concern the religious beliefs and theological lessons of the stories. For example, some of the questions have been: "Which day did God make the sun and the moon?" and "How did Jesus want us to treat our enemies?" Thompson also has the young children act out the Bible stories contained in the book. This practice cannot legitimately be contended to be of secular education. The stories and their titles are and contain proclamations of religious doctrine and plainly reveal the book's religious perspective. Indeed, the cover of the book proclaims that it will teach children "the truths of God's Word" and how to relate it "to everyday experiences." [10]

In grades 3–6, Thompson uses the King James Bible as the basis for the class. In direct contrast to regular secular subjects like math, there is no homework, testing, or grades given. In these classes, Thompson continues the tasks begun in kindergarten of repeatedly teaching the students the same events depicted in the Bible. Moreover, he adds other lesson plans that deal with the application of the Bible to daily life—a pastoral or religious task in itself. Similar to his method of instruction in grades K–2, Thompson's lesson plans for grades 3–6 are all identical for each grade and from the previous year's lessons. This repetition of the same course for four more consecutive years illustrates an intent to indoctrinate a specific philosophy or belief system into the students

which is obviously fundamentalist Christianity.

Thompson further testified that he teaches the Bible not as a work of fiction, but as a historic record, i.e., as a record of what actually occurred in the past. When asked how he deals with the virgin birth and Jesus' miracles and the resurrection as historically viable events, Thompson stated, "We just study it as the Bible explains it: This event happened, this event happened, this event. We're teaching the historical account, so I want my students to understand the details of those events." This is inherently religious instruction, rather than objective, secular education, since much of the Bible is not capable of historic verification (such as divine creation, the "pre-existence" of Jesus, Jesus' miracles, and the resurrection), and can only be accepted as a matter of faith and religious belief. As the court explained in *Wiley:*

> [T]he Bible is a religious book, or, more accurately stated, a collection of religious books and writings which have been selected and assembled for the religious teachings and messages therein conveyed. To the believer those writings and books were themselves Divinely inspired and were assembled into the Bible under Divine guidance. Thus, *to simply read the Bible without selectivity is to read a religious book and to teach the Bible literally without interpretation is to convey a religious message or teach a religious lesson.*

468 F.Supp. at 149 (emphasis added). *Accord Doe,* 725 F.Supp. at 1506.

The District's argument that the course can be saved (no pun intended) by prefacing each discussion of a biblical event with "The Bible says . . ." or noting that not everyone believes the Bible, is without persuasion. Even the defendant's experts agree that, insofar as the young elementary grades are concerned, that distinction is meaningless. [11] Furthermore, the daily teaching of

---

**10.** Thompson continued to use the same lesson plans and materials in grades K–2 the following year. This means that the children who were in his kindergarten and first grade classes last year, and who are now in his first and second grade classes, are taking the same course all over again. Dr. Lewis commented that the lesson plans for grades K–2 were all identical, under-

scoring that the purpose and effect of the classes are inculcation of the students in the Christian Bible.

**11.** Dr. Mohler, the defendants' expert, explained that critical thinking and reasoning are necessary tools a student must have to understand the distinction between an actual event and the fact

the content of a book of religious proclamation does not become secular instruction merely by informing students that the content is only what the Bible says; indeed, for many students, that may well heighten the religious effect of the course.

Other evidence of the course's purpose and effect can be seen in the films shown by Thompson during 1994–1995. The film "The Evidence for Creation" is a clearly sectarian product designed to persuade the audience to accept the creationist's view. It consists in large measure of Bible verses and preaching. The defendants have not explained the relevance of creationism in a course that is supposedly a historical survey of the Middle East from 2000 B.C. to 100 A.D., nor can the court conceive of any reason why it would be relevant.

Likewise, "America's Godly Heritage" has no place in a history class focusing on the ancient Middle East. The significance of what the past 200 years of *America's* heritage has to do with 2000 year old cultures in the Middle East is lost on the court. The film teaches that "the United States was founded as a Christian nation" and that the current "moral and social crisis of America" are "due largely to the elimination of Christianity from the public sphere...." While some or all of this film may be very true, the only implication the court can draw from the showing of this and other religious films to a class of students supposedly studying Middle East history is that the teachers are attempting to indoctrinate the students in their religious beliefs by claiming to teach Middle East history. This practice cannot be condoned in the context of a public school system. It is best left to the family and the church.

After allowing the newly named course with the old substance to be taught for credit for three years, Ms. Prewitt's recommendations to the MSDE confirm the constitutionally impermissible nature of the classes. After reviewing the current curriculum and its business as usual method of teaching the

pilot course, inter-departmental memos indicate that the MSDE would not continue to approve the course as it is currently taught. In a memo from the Director of the Office of Instructional Development to the Office of Academic Education, the Director recommended against including the course in the state curriculum. Instructive are the reasons given:

—Objectives are given in detail, yet still do not demonstrate a balance of view points (religious and non-religious).

—The curriculum does not emphasize the history of the Biblical period, as the title of the course suggests, but rather the study of the Bible.

—Some topics/many topics are specifically for preaching purposes rather than teaching about a time period. Such examples of improper vocabulary are: ... "Yahweh's plan for you".

—The major textbook is the Bible and other Biblical references are used. Other historical references should be used.

—Worksheets emphasize scriptural research and analysis.

—No *historical* analysis is present, to any great extent, in the curriculum.

—The purpose of the course is not clearly stated, content objective in many cases are vague or religious in nature.

These concerns by the MSDE echo the court's own concerns and reveal a distinctive religious exercise that has no place in the state's public school system, but is appropriate to private schools, the family and the church.

### 3. The Entanglement Prong

The third and final prong of *Lemon* is also well represented in the case *sub judice*. Although a separate and distinct element of the test, many of the factors considered by the court above are applicable to the entanglement analysis. Suffice it to say that "if an evidently religious study course is taught on school grounds during regular school hours,

---

that people believe an event to have occurred. He explained that pre-adolescents and some adolescents do not have this critical reasoning ability. Thus, he admits that at least in the K–2

classes, the students are unable to distinguish between the teacher's disclaimer of "The Bible says ..." and the actual occurrence of the alleged biblical event.

the school is excessively entangled in it regardless of who teaches the class." *Doe,* 725 F.Supp. at 1507. Furthermore, the court cannot distinguish this case from the *McCollum* decision which indicated:

> [T]he use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education. The operation of the State's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. ... *This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith.*

*McCollum,* 333 U.S. at 209–10, 68 S.Ct. at 464 (emphasis added). Thus, all three prongs of *Lemon* are violated and the Bible class fails constitutional muster.

### B. The Endorsement Test

■ The government unconstitutionally endorses religion whenever it appears to "take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community." *County of Allegheny v. ACLU,* 492 U.S. 573, 594, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984)). This appearance is conveyed when the government implicates that religion is "favored," "preferred," or "promoted" over other beliefs. *Ingebretsen,* 88 F.3d at 280. The District is clearly favoring religion over irreligion and preferring fundamentalist Christianity to the exclusion of all others.

### C. The Coercion Test

■ The final test, and the Supreme Court's most recent attempt at analyzing Establishment Clause jurisprudence, was developed in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). In *Lee,* the Court expressly rejected invitations by many parties, including the United States, to abolish the *Lemon* test. Thus, *Lemon* remains in force. The Court, however, found the practice at issue violative of the Estab-lishment Clause not through an analysis of *Lemon,* but through a finding of coercion. Although it appears clear that coercion is not a requirement to find a practice impermissible, *see id.* at 604, 112 S.Ct. at 2664 (Blackmmum, J. concurring); *Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572; *Wallace v. Jaffree,* 472 U.S. 38, 72, 105 S.Ct. 2479, 2498, 86 L.Ed.2d 29 (1985), if such a practice has coercive effects it would clearly violate the First Amendment. Thus, in *Lee* the Court did not need to consider *Lemon* because it found an even more egregious activity at work—the coercion of students.

■ The *Lee* Court noted that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee,* 505 U.S. at 592, 112 S.Ct. at 2658. In the elementary grades, the District has inserted into its rotational system a course which is manifestly religious in nature. The District has woven this course of study into a seamless transition from purely secular activities such as music or physical education, into a study of fundamentalist Christian doctrine. Thus, the plaintiff's young children are faced once a week with the difficult choice of conforming to the overwhelming majority's participation in the class or absenting themselves in protest. Furthermore, the lack of genuine alternative instruction elevates the coercive pressures placed on the plaintiff's children. As the Court in *Lee* stated, "we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position." *Id.* at 593, 112 S.Ct. at 2659.

■ The plaintiff urges the court to enjoin the District from allowing any teachers into the public schools who are recruited and paid by the Bible Committee of the several churches who have been funding the program. The court is disinclined to do so at this point. Although the court believes it will be very difficult for the course to be taught objectively and secularly by a teacher selected by a group which has traditionally selected teachers on the basis of their religious beliefs, both the plaintiff's expert and the defendants' expert testified that it was possi-

ble to teach an objective secular course of Middle East history if certain teaching outlines were followed. The defendants have, however, intentionally misled the MSDE by merely changing the name of its biblical history course but not the fundamentalist religious theme of the course in order to continue to receive state approval. It took the MSDE several years to react to that and disapprove the course, according to the school's witnesses at trial. The court declines to prohibit a church-paid teacher from teaching at this time on the assumption that the MSDE will be more aggressive in monitoring the course. Three years was obviously too long to allow a patently religious course to continue under the guise of a new name. The court also further assumes that the District will monitor the course closely and require any teacher to comply with the ruling herein, and that the District will satisfy itself that teachers it accepts have not been selected on the basis of a religious belief test and do not have an agenda to proselytize.

## V. RELIGIOUS INSTRUCTION IN CLASSROOMS

The final issue the court is called upon to review is the alleged proselytizing and airing of sectarian videotapes by eighth grade American History teacher Frank Cayson. As to any alleged proselytizing to his students, the District recognizes that such a practice, if occurring, would be unconstitutional and the District has instructed Cayson that he is not to preach or proselytize in his classroom. The District's policy against such practices is sufficient for the plaintiff. There being no cause of action against Cayson individually, the court will not comment further.

■ As to the District's authorization of certain videotapes to be shown to Cayson's students, the court finds that the videos are without question religious proclamation and cannot, in the context presently intended, be utilized constitutionally. At trial, Cayson testified that he shows the following videos: "The King is Born," "He is Risen," and "America's Godly Heritage." According to Cayson, he shows the videotapes to explain the "real purpose" of the school holidays of Christmas and Easter. He explains that many children believe they are dismissed from school in December because of exams or the pending arrival of Santa Claus and in April because of the Easter Bunny. Cayson states that by showing the films he is attempting to instruct his students on the "real" reason they are having the holiday— that is the "fact" that Jesus Christ was born and later died and was resurrected.

These practices obviously violate the neutrality that a public teacher is required to maintain toward religion, and constitute impermissible religious instruction and endorsement of religion by a public official which crosses the wall the constitution erected between the scepter and the cross, and the defendants are directed to not allow any such activities by its teachers and to take swift and strong action if the District's policies are violated.

Some of the defendants argue that this ruling will stifle all prayer in schools, but the court feels confident that as long as there are tests in schools there will be prayers there also.

An order will issue accordingly.

### *ORDER*

In accordance with the memorandum opinion this day issued, it is ORDERED:

That each of the defendants and anyone acting in concert with any of them are permanently ENJOINED AND RESTRAINED from (1) transmitting or authorizing the transmission of devotionals, including without limitation the recitation of Bible verses and/or prayers, over the school intercom system; (2) authorizing organized, vocal group prayers in classrooms during classroom hours at North Pontotoc; (3) authorizing the teaching of classes known as "Bible" or "A Biblical History of the Middle East," in their past or present form, in any grade; and (4) authorizing the showing of the videotapes "The King is Born," "He is Risen," and "America's Godly Heritage" during American History classes; and

That the defendants shall specifically direct all elementary teachers and other em-

ployees at North Pontotoc, and strictly enforce its directive, that they may not facilitate, participate in, endorse, encourage, invite or sponsor classroom prayer by students, including but not limited to designating, facilitating or assisting in designating, or enlisting individual students to lead vocal group prayer, delaying or slowing departure of students for the lunchroom to facilitate prayer, separating students who do and do not wish to engage in such prayer, or engaging in the conduct concerning the "Blessing for Lunch" contained in the instructions issued by defendant Flowers on or about January 3, 1995 as set forth in Exhibit P3; and

That if the Mississippi State Board of Education does give final approval to the new high school course "Biblical History of the Ancient Middle East," the defendants may offer that course in those grades (9–12), but the defendants and anyone acting in concert with them are permanently ENJOINED from teaching that or any other or successor course concerning the Bible or religion in any manner that is not consistent with this court's decision and the United States Constitution. This includes but is not limited to the following: (a) the course must be taught objectively as part of a secular program of education; (b) the course may not be taught using the Bible as the only source of historical fact or as if the Bible were actual literal history; (c) students must be assigned reading from non-biblical sources of ancient Middle East history; (d) the course may not teach religious doctrine or sectarian interpretation of the Bible; and (e) the District shall not accept an instructor for the Bible course who has been approved for employment based in whole or in part on a religious test, profession of faith or criteria involving particular beliefs about the Bible in the selection process.